Argued and submitted April 8, affirmed October 12, 2005

Genevieve G. LAHMANN
and Roger A. Stolley,
*Plaintiffs,*

*and*

Elaine SHIMER,
*Respondent,*

*v.*

GRAND AERIE OF
FRATERNAL ORDER OF EAGLES,
Fraternal Order of Eagles,
Oregon State Aerie
and Fraternal Order of Eagles,
Willamette Aerie No. 2081,
*Appellants.*

99C-17528; A122320

121 P3d 671

124

Charles F. Hinkle argued the cause for appellants. With him on the briefs was Stoel Rives LLP.

Dana L. Sullivan argued the cause for respondent. With her on the brief was McKanna Bishop Joffe & Sullivan, LLP.

Before Wollheim, Presiding Judge, and Edmonds* and Schuman, Judges.

SCHUMAN, J.

Edmonds, J., dissenting.

---

* Edmonds, J., *vice* Richardson, S. J.

**SCHUMAN, J.**

This case requires us to decide whether the Fraternal Order of Eagles' policy of barring women from membership in its "aeries" violates the Public Accommodations Act, *former* ORS 30.670 to 30.685 (1999),[1] and if so, whether enforcement of the act so as to compel the organization to consider applications from women would be unconstitutional. The case is before us for the second time. In our first opinion, we held that the act prohibits an organization such as the Eagles from discriminating in its membership policies on the basis of sex if the organization is a "business or commercial enterprise" and "its membership policies are so unselective that the organization can fairly be said to offer its services to the public." *Lahmann v. Grand Aerie of Fraternal Order of Eagles*, 180 Or App 420, 434, 43 P3d 1130, *rev den*, 334 Or 631 (2002) (*Lahmann I*). We remanded the case to the trial court, however, because, on the record before us, we were unable to determine whether those factual predicates existed. The trial court found that they did and entered a judgment against the Eagles.[2] The Eagles appeal, renewing their arguments that the act does not apply to them and that, if it does, such an application is unconstitutional. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

Established in 1898, the Fraternal Order of Eagles is a national fraternal organization with over one million members. The group's stated purpose is to promote principles of "liberty, truth, justice, [and] equality, for home, for country, and for God." At the national level, the Eagles have supported the enactment of pension and workers' compensation laws. At the state and local level, members perform community service projects and socialize together.

---

[1] In 2001, ORS 30.670 to 30.685 were renumbered as ORS 659A.400 to 659A.409 and amended in ways that are not relevant to this case. References to the Public Accommodations Act in this opinion are to the 1999 version, unless otherwise noted.

[2] We use the term "Eagles" to refer variously to defendant organizations, the national Fraternal Order of Eagles and its Oregon and Willamette Aeries, and to aerie members.

The Eagles have a national governing body called the Grand Aerie, which oversees state and local aeries. It does so by issuing "statutes," one of which establishes the membership requirement at issue in this case: "No person shall be eligible to be elected to membership in any Local Aerie unless such a person is a male, is of good moral character, and believes in the existence of a Supreme Being[.]" Although that requirement has been in existence since the organization's founding, the Grand Aerie in 1952 authorized the establishment of "Ladies' Auxiliaries" for women at the local and national levels. According to the Ladies' Auxiliary Rules and Regulations, the Grand Aerie retains "complete jurisdiction and control over the Grand [Ladies'] Auxiliary" with limited exceptions, and the "Grand [Ladies'] Auxiliary shall have no purposes that are apart from the aims of the Fraternal Order of Eagles." A local aerie may be affiliated with an auxiliary, but auxiliary members may not attend aerie meetings or vote on aerie matters.

In 1995, the Grand Tribunal of the Eagles, a branch of the national organization charged with interpreting the Eagles' constitution, issued an opinion stating that "the use of the word 'male' in [the membership requirement] is not consistent with prevailing civil law." As a result, the Willamette aerie, along with many others, admitted some women to membership. That practice, however, was short lived. In 1998, the Grand Aerie rejected a proposal to abandon the male-only requirement for aerie membership, and the Grand Tribunal withdrew its opinion concerning the male-only requirement. Since then, the Grand Aerie has not permitted local aeries to accept membership applications from women, and the Willamette aerie has followed that policy.

The Willamette aerie has an auxiliary. The two groups share a lodge, which features a bar, dining facilities, a dance floor, and meeting rooms. In 1999, plaintiff, a member of the Willamette auxiliary, applied for membership in the Willamette aerie, but her application was rejected on the basis of her gender. Thereafter, plaintiff (and two other rejected female applicants who have since voluntarily dismissed their claims) initiated this action under the Public Accommodations Act against the national, state, and local aeries, seeking declaratory and injunctive relief.

The relevant parts of the act are ORS 30.670 and ORS 30.675. ORS 30.670 stated:

> "All persons within the jurisdiction of this state shall be entitled to the full and equal accommodations, advantages, facilities and privileges of any place of public accommodation, without any distinction, discrimination or restriction on account of race, religion, sex, marital status, color or national origin."

ORS 30.675 defined the phrase "place of public accommodation":

> "(1)   A place of public accommodation, subject to the exclusion in subsection (2) of this section, means any place or service offering to the public accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements or otherwise.
>
> "(2)   However, a place of public accommodation does not include any institution, bona fide club or place of accommodation which is in its nature distinctly private."

On cross-motions for summary judgment, the trial court denied defendants' motion and granted plaintiffs', ruling that the organization is a "place of public accommodation" because it emphasizes recruitment, offers its services to the public, and is unselective in recruiting except for its rule against admitting women to aeries. The Eagles appealed, arguing that the trial court's understanding of "place of public accommodation" was too expansive. *Lahmann I*, 180 Or App at 424. According to the Eagles, the act did not apply to fraternal organizations. As noted, we rejected that position and explained that "the question whether an organization is a place of public accommodation under the act turns on (1) whether it is a business or commercial enterprise, and (2) whether its membership policies are so unselective that the organization can fairly be said to offer its services to the public." *Id.* at 435. We explained that the term "business or commercial enterprise" includes organizations that market civic or social benefits. *Id.* We remanded the case so that a finder of fact could determine whether the organization is a "place of public accommodation" under that two-part definition. *Id.*

On remand, plaintiffs prevailed after a bench trial. The trial court found that

"the Eagles provide '* * * services, * * * amusements or otherwise.' It is clear that the Eagles offer few economic or business benefits but these are not the sole criteria for the statute. Civic and social benefits also meet the statutory requirements in that they are services and amusement.

"It is also this Court's opinion that the Eagles met the second criteria as set out in the Court of Appeals opinion. Either the written requirements, or actual practices of this Aerie are so loose and nonselective that it can easily be said that the Eagles offer their services to the public. The net effect of these very easy membership requirements is that it cannot be said that the Eagles are '* * * in its nature distinctly private' [under ORS 30.675(2)]."

The trial court entered a judgment declaring that "the policy of the defendants to exclude women" from Eagles membership "violates the State of Oregon's prohibition against discrimination in places of public accommodation" and enjoining the Eagles "from refusing to process any application for membership submitted by a woman who is otherwise qualified for Eagles membership." This appeal ensued.

Before this court, the Eagles do not contest the trial court's factual determination that the club's membership requirements are "so loose and nonselective that it can easily be said that the Eagles offer their services to the public." Nor do they argue (beyond a cursory sentence in their "Summary of Argument") that the trial court erred in concluding that their organization is a business enterprise because they market civic or social benefits. Rather, they present two purely legal arguments. First, they contend that, notwithstanding our opinion in *Lahmann I*, even if a fraternal organization such as the Eagles has an open admission practice, it nonetheless is exempt from the act because it is a "bona fide club or * * * is in its nature distinctly private." ORS 30.675(2). They base that argument on what they characterize as an analytic error in *Lahmann I* and on legislative history that was not brought to our attention before we wrote that opinion. Second, the Eagles argue that, if our analysis of the act is correct, then it cannot constitutionally be applied against them because doing so would violate several constitutional rights: the right of religious freedom guaranteed by Article I, sections 2 and 3, of the Oregon Constitution; the right to

"assemb[le] together in a peaceable manner to consult for their common good" guaranteed by section 26; and the right of "expressive association" found in the First Amendment to the United States Constitution. We find neither argument to be persuasive.

## II. APPLICABILITY OF THE
## PUBLIC ACCOMMODATIONS ACT

■ In their first assignment of error, the Eagles take issue with our conclusion in *Lahmann I* that an organization that bars women but otherwise has a *de facto* open membership policy cannot qualify for the act's exemption for distinctly private organizations. The first impediment that argument confronts is the "law of the case" rule. As the Oregon Supreme Court has explained, "when a ruling or decision has been once made in a particular case by an appellate court, while it may be overruled in other cases, it is binding and conclusive * * * upon the appellate court itself in any subsequent appeal * * *." *State v. Montez*, 324 Or 343, 347, 927 P2d 64 (1996), *cert den*, 520 US 1233 (1997) (quoting *State v. Pratt*, 316 Or 561, 569, 853 P2d 827 (1993)). The Eagles acknowledge the general applicability of the rule, but they point out that we have in the past recognized that "[t]he law of the case doctrine is essentially one of judicial economy and judicial discretion," *State v. Metz*, 162 Or App 448, 454, 986 P2d 714 (1999), *rev den*, 330 Or 331 (2000), and that the rule "is generally not applied with the same rigor as res judicata," *Morley v. Morley*, 24 Or App 777, 781, 547 P2d 636 (1976).

Although we may, as the Eagles argue, exercise the discretion to waive a rigid application of the rule when we independently discover (or a party brings to our attention) a persuasive new argument, particularly one based on new information or new developments in the law, this case does not present an appropriate occasion for such a waiver. The Eagles' new arguments are not persuasive.

■ In their first argument, they contend that our opinion in *Lahmann I* significantly and prejudicially misconstrues binding precedent. They reason as follows. In *Schwenk v. Boy Scouts of America*, 275 Or 327, 336, 551 P2d 465

(1976), the Supreme Court held that the Boy Scouts did not qualify as a "public accommodation" under the act. The court reached that decision despite the fact that it knew from the parties' briefs that the organization was open to all male applicants of the appropriate age. Thus, the Eagles conclude, it must be true that an organization with a *de facto* nonselective membership policy *can* qualify for the exemption. We therefore erred in *Lloyd Lions Club v. Int. Assoc. of Lions Clubs*, 81 Or App 151, 157, 724 P2d 887 (1986), *rev dismissed*, 303 Or 698 (1987), when we held that an organization with a *de facto* nonselective membership policy *cannot* be a distinctly private organization for purposes of the act. It necessarily follows that our opinion in *Lahmann I*, which relied on *Lloyd Lions Club*, was itself wrongly decided; we followed one of our own opinions when we should have followed the contrary, governing opinion by the Supreme Court.

■       That argument does not survive scrutiny. ORS 30.675 stated a two-part inquiry for determining what organizations are "public accommodations" and therefore covered by the act's nondiscrimination rule. The first part, ORS 30.675(1), stated the general types of organizations that are covered by the act: those that offer particular specified goods or services. If an organization does not offer such goods or services, then it is exempt from the act. Further, the act does not apply if the organization is "distinctly private." ORS 30.675(2). Thus, an organization is exempt from the act in either of two circumstances: first, if it does not provide the specified services, *or* second, if it is distinctly private.

The Eagles are of course correct to point out that the necessary implication of *Schwenk* is that an organization that is nonselective can be exempt. That situation can occur if the organization, in addition to being nonselective, is also one that does not provide the specified goods or services. Such an organization is exempt regardless of whether it is selective or nonselective *because* it does not provide the specified goods or services. The Boy Scouts, according to *Schwenk*, is that kind of organization: The act did not apply there because the services offered by the Boy Scouts were not subject to the provisions of the act. 275 Or at 335. The court never addressed the nonselectivity issue. It never suggested that a nonselective

organization that *did* provide the specified goods or services—such as the Lions Club—could (contrary to the plain meaning of the act) be exempt. Thus, when we held in *Lloyd Lions Club* that the club, which we held to be nonselective, was not exempt, we did not contradict *Schwenk*. Both cases are correct, both are consistent with the act, each is consistent with the other, and neither is inconsistent with the holding in *Lahmann I*: The act applies to an organization that both provides the benefits specified in ORS 30.675(1) and is not distinctly private as specified in ORS 30.675(2).

■     The Eagles' second argument for reconsidering our holding in *Lahmann I* is based on legislative history, and it reduces to the following proposition: When the act was first passed and when it was amended, private fraternal organizations had a well-established, legislatively recognized presence; the sponsors of the act and those who voted on it knew that fact, and they explicitly averred that the act would not apply to those organizations. It would, however, apply to organizations that called themselves private clubs only as a ruse to avoid allowing African-American patrons or members. The short and sufficient refutation of that argument is this: The trial court found as fact, and the Eagles do not deny, that, due to their nonselective membership practices, their organization is *de facto* open to the public. Nothing in the legislative history of the act implies that its framers intended to exempt such organizations.[3]

---

[3] The dissent argues that the question whether the Eagles are "distinctly private" is a mixed question of fact and law, and the legal issue is whether an organization with a nonselective admission policy can be called "distinctly private" for purposes of the act. 202 Or App at 152 (Edmonds, J., dissenting). That is correct. However, it is a legal question that we decided in *Lahmann I*, contrary to the dissent's current position (a position, we note, that the Eagles themselves do not here argue). In that case, we reiterated our position in *Lloyd Lions Club v. Int. Assoc. of Lions Clubs*, 81 Or App 151, 157, 724 P2d 887 (1986), *rev dismissed*, 303 Or 698 (1987), that "some private organizations may have such unrestrictive membership criteria that the organization is effectively open to the public." *Lahmann I*, 180 Or App at 429. We then restated that legal conclusion and remanded the case to the trial court to decide the remaining fact question—whether the Eagles "membership criteria are so generally unselective that they offer their product—membership in their organization—to the public." *Id.* at 434. The trial court held that the criteria were, in fact, that unselective. Evidence supports that finding.

### III. CONSTITUTIONALITY OF APPLYING THE ACT TO THE EAGLES

Having concluded that the act compels the Eagles to accept and fairly consider applications from women, we must now address the Eagles' arguments that such compulsion violates their rights under the religion and free assembly clauses of Article I, sections 2, 3, and 26, of the Oregon Constitution, and their so-called rights of expressive association under the First Amendment to the United States Constitution. We begin with their arguments under the Oregon Constitution. *State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983).

A. *Article I, sections 2 and 3*

Article I, section 2, of the Oregon Constitution provides:

> "All men [*sic*] shall be secure in the Natural right, to worship Almighty God according to the dictates of their own consciences."

Article I, section 3, of the Oregon Constitution provides:

> "No law shall in any case whatever control the free exercise, and enjoyment of religeous (*sic*) opinions, or interfere with the rights of conscience."

The Eagles contend that "the [a]ct cannot be constitutionally applied to the Eagles' membership policy, because a particularized theistic religious belief is a prerequisite to membership * * *." The trial court ruled that this case does not implicate the Eagles' religious freedom because, in essence, they are not being compelled to admit atheists. The Eagles respond that "[i]f the [a]ct applies to defendants' membership policies, then *all* of the [a]ct applies." (Emphasis in original.)

■  We agree with the trial court. Plaintiff's complaint against the Eagles challenges only the gender-based admission. The judgment from which the Eagles seek relief declares only that policy to be a violation of the act, and it enjoins them from pursuing only that policy. The Eagles' constitutional defense, therefore, can be relevant only to the gender policy. Put another way, the Eagles cannot in this case raise a facial attack on the entire act, including its asserted

requirement that they accept nonbelievers, because nobody has challenged their policy of rejecting nonbelievers, and no court has commanded them to cease that practice. If in fact the Eagles have such a policy, and if a plaintiff with standing challenges it, and if a lower court determines that the policy violates the act, then we would have the occasion to determine whether enforcement of the act against the Eagles violates Article I, sections 2 and 3. At this time, the issue is not before us.

B. *Article I, section 26*

■      We next turn to the question whether application of the act to the Eagles violates their members' rights of assembly under Article I, section 26, of the Oregon Constitution, which states:

> "No law shall be passed restraining any of the inhabitants of the State from assembling together in a peaceable manner to consult for their common good; nor from instructing their Representatives; nor from applying to the Legislature for redress of greviances (*sic*)."

According to the Eagles, application of the act restrains their members "from assembling together in a peaceable manner to consult for their common good[.]"

The trial court ruled that the Eagles' argument under section 26 was controlled by *Roberts v. United States Jaycees*, 468 US 609, 104 S Ct 3244, 82 L Ed 2d 462 (1984). According to the trial court, that case stands for the proposition that "[t]he right of assembly is not absolute and may be restricted * * * in order to protect the citizenry from the harm of gender discrimination." The trial court seemed to assume that section 26 confers a right of association that is coextensive with the right of "expressive association" in the First Amendment. However, in the Oregon Bill of Rights, the right to assemble stands in a section discrete from the rights of free speech and free exercise of religion. It differs from its federal counterpart in text, context, judicial gloss, and historical underpinning. To the extent that *Roberts* is relevant to this case, it is relevant to the Eagles' federal claim, and we discuss it in that context below. The Eagles' argument under section 26 requires a separate inquiry.

Underlying that argument are two premises. The first is that the "assembling together" to which the section refers includes assembly whose primary objective is what the trial court found the Eagles' purpose to be—marketing civic or social benefits such as amusement—and is not limited to assembly directed primarily toward determining some political policy or achieving some political objective. The second premise is that freedom to assemble necessarily implies freedom to exclude unwanted participants from the assembly. In order to prevail, the Eagles must be correct in both of those premises. Because we conclude below that the first premise is wrong, we do not deal with the second premise.

The existing case law provides no support for the conclusion that section 26 applies to social gatherings or, indeed, to any gatherings other than those dedicated to political advocacy. When Oregon courts discuss section 26, they do so exclusively in that context.[4] Although we mentioned section 26 in *Lloyd Lions Club*, 81 Or App at 158, we did so only to report that the defendants had cited that provision in their argument. We did not discuss it.

The text of section 26, on the other hand, provides useful interpretive material. It protects the rights of "the inhabitants" to engage in three activities: "assembling together * * * to consult for their common good," "instructing their Representatives," and "applying to the Legislature for redress of greviances (*sic*)." The uncomplicated structure of the section suggests that the three protected activities are substantively related; no original section of Article I serializes a list of unrelated rights. The last two rights, instruction of representatives and applying to the legislature for redress of grievances, are unequivocally political. Thus, the section's

---

[4] *See State v. Ausmus*, 336 Or 493, 507, 85 P3d 864 (2004) (declaring a statute overbroad because it could interfere with, for example, assembly intended to alarm, annoy, or inconvenience government leaders); *Vannatta v. Keisling*, 324 Or 524, 547-48, 931 P2d 770 (1997) (regulation of elections; campaign finance limitations); *Huffman and Wright Logging Co. v. Wade*, 317 Or 445, 459-60, 857 P2d 101 (1993) (punitive damages imposed against political protesters); *Deras v. Myers*, 272 Or 47, 54, 535 P2d 541 (1975) (regulation of elections; campaign expenditure limitations); *State v. Laundy*, 103 Or 443, 462, 204 P 958 (1922) (section 26 would *not* prohibit "assemblages from counseling the commission of a crime"); *Ladd v. Holmes*, 40 Or 167, 189, 66 P 714 (1901) (regulation of elections; political parties); *Fidanque v. Oregon Govt. Standards and Practices*, 141 Or App 495, 506, 920 P2d 154 (1996), *rev'd on other grounds*, 328 Or 1, 969 P2d 376 (1998) (regulation of political action; lobbyist registration fees).

wording suggests that "assembling together" refers to assembly for deliberation about issues affecting the welfare of the public (the "common good" of "the inhabitants"), and the balance of the section protects the ability of "the inhabitants" to give practical effect to their deliberations by ensuring that they may voice their determinations to others who might respond politically.

The operative terms of the section, as they were defined in Noah Webster, *An American Dictionary of the English Language* (1828) (photo reprint 1970), support that interpretation. The phrase "to assemble," when used intransitively, meant, "[t]o meet or come together; to convene, as a number of individuals." Webster, *An American Dictionary* at 14. Thus, "assembling together" is easily understood as convening in a single body, or "assembly." Moreover, as we explain below, meeting together to confer about issues affecting society was precisely the province of the "assembly," a town-based, political body that deliberated over "instructions" to representatives in eighteenth- and nineteenth-century America.

The term "consult," when used as an intransitive verb, indicated deliberation by a collective body to develop a position:

"1. To seek the opinion of another by, a statement of facts, and suitable inquiries, for the purpose of directing one's own judgment; followed by *with*.

"Rehoboam *consulted with* the old men. 1 Kings 12. David *consulted with* the captains of thousands. 1 Chronicles xiii.

"2. To take counsel together; to seek opinions and advice by mutual statements, enquiries and reasonings; to deliberate in common.

"The chief priests *consulted* that they might put Lazarus to death. John xii.

"3. To consider with deliberation. Luke xiv."

*Id.* at 47 (emphasis in original). Thus, "assembling together to consult" meant to gather and deliberate in order to formulate a judgment or policy. The purpose of the group deliberation, determining and promoting "the common good" of "the inhabitants," also indicates political objectives. Thus, when

section 26 was drafted, as now, protecting the right of the inhabitants of the state to assemble together to consult for their common good cannot plausibly be construed to mean protecting the right of a self-selected group to share drinks, food, and fellowship—the "amusements" or "civic and social benefits" that the trial court found to be the primary service provided by the Eagles.

An examination of the historical foundation on which section 26 was built also demonstrates that its objective was to protect the people's right to gather for the purpose of deliberating on and promoting political policies. Although we lack documentation of the Oregon framers' purpose for enacting section 26, an examination of the general historical circumstances that led to the creation of similar assembly clauses supports the conclusion that the section was aimed at protecting the people's ability to convene deliberative gatherings for the purpose of promoting the "common good," formulating policy positions, and taking them to the political arena.

There is no evidence of debate concerning section 26 in the sessions of the standing committee on the Bill of Rights at the Oregon Constitutional Convention, and the Oregon framers adopted the provision with no discussion. *See generally* Charles Henry Carey ed., *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857* (1926); *see also* Claudia Burton and Andrew Grade, *A Legislative History of the Oregon Constitution of 1857 Part I (Articles I & II)*, 37 Willamette L Rev 469, 544 (2001) (noting absence of evidence of debate on section 26). The proceedings of the Oregon Constitutional Convention indicate, however, that the Bill of Rights of the Indiana Constitution served as a model for Oregon's. *See, e.g.*, Carey, *The Oregon Constitution* at 101-02 (remarks of convention delegate Delazon Smith advocating the inclusion of a bill of rights in the Oregon Constitution and characterizing the Indiana Constitution of 1851 as the "best pleas[ing]" "of all the constitutions of all the states"). Article I, section 26, of the Oregon Constitution is identical to Article I, section 31, of the Indiana Constitution of 1851, and it is not difficult to conclude that section 26 was drawn directly from that document. *See* Carey, *The Oregon*

*Constitution* at 469 (tracing sources of the Oregon Constitution); Burton and Grade, 37 Willamette L Rev at 483-84 (reviewing the sources of the Oregon Constitution and noting the strong circumstantial evidence that the "members of the Committee on Bill of Rights drew heavily on the Bill of Rights of the Indiana Constitution of 1851 when drafting Oregon's Bill of Rights").

The 1850 Indiana Constitutional Convention adopted its version of the assembly clause on December 6, 1850, without amendment or debate. 1 *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana 1850*, 989 (1850). The source of Indiana's assembly clause is unclear. Parts of the Indiana Constitution of 1816, subsequently amended by the 1850 Indiana Constitutional Convention, may have been modeled on provisions in other state constitutions, including those of Ohio, Kentucky, Tennessee, and Pennsylvania. *See generally* Robert Twomley, *The Indiana Bill of Rights*, 20 Ind L J 211, 212-13 (1944). The assembly clauses in those possible models are strikingly similar, frustrating attempts to trace the "bloodline" of Oregon's assembly clause to predecessors that predate the Indiana Constitution.[5] There is no record of case law interpreting the assembly clause of the Indiana Constitution before the enactment of the Oregon Constitution.

---

[5] Article VIII, section 19, of the Ohio Constitution of 1802 states:

"That the people have a right to assemble together, in a peaceable manner, to consult for their common good, to instruct their representatives, and to apply to the legislature for a redress of grievances."

Article XII, section 22, of the Kentucky Constitution of 1792 states:

"That the citizens have a right, in a peaceable manner, to assemble together for their common good, and to apply to those invested with the powers of government for redress of grievances or other proper purposes by petition, address, or remonstrance."

Article IX, section 20, of the Pennsylvania Constitution of 1790 states:

"The citizens have a right in a peaceable manner to assemble together for their common good, and to apply to those invested with the powers of government for redress of grievances or other proper purposes, by petition, address or remonstrance."

Article XI, section 22, of the Tennessee Constitution of 1796 states:

"That the citizens have a right, in a peaceable manner, to assemble together for their common good, to instruct their representatives, and to apply to those invested with the powers of government for redress of grievances, or other proper purposes, by address or remonstrance."

Lacking useful evidence of the intent of the framers of either the Oregon or Indiana conventions concerning section 26, or its likely model, we are left to seek out "historical circumstances" more generally.

The right of the people to voice their concerns to governmental representatives is evident in the Magna Carta,[6] but the predicate right to *gather* in order to deliberate matters appears to have grown out of the historical context of town governance in prerevolutionary America. A useful starting point for appreciating the significance of the right of assembly is eighteenth-century Massachusetts, where town assemblies served a vital role in government, and where British attempts to suppress assemblies would contribute to the declaration and preservation of assembly rights across the young nation.

John Adams's Letter to Abbe De Marly described town inhabitants' practice of gathering and deliberating issues of consequence in colonial Massachusetts:

> "These towns contain upon an average, say six miles or two leagues square. The inhabitants who live within these limits are formed by law into corporations, or bodies politic, and are invested with certain powers and privileges, as for example, to repair the great roads or highways, to support the poor, to choose their selectmen, constables, collectors of taxes, and above all, their representatives in the legislature; as also, *the right to assemble, whenever they are summoned by their selectmen, in their town halls, there to deliberate upon the public affairs of the town, or to give instructions to their representatives in the legislature.* The consequences of these institutions have been, that the inhabitants, having acquired from their infancy the habit of discussing, of deliberating, and of judging public affairs, it

---

[6] In Chapter 61 of Magna Carta, the king promised

"that if we or our justiciar, or our bailiffs, or any of our servants shall have done wrong in any way toward any one, or shall have transgressed any of the articles of peace or security and the wrong shall have been shown to four barons of the aforesaid twenty-five barons, let those four barons come to us or to our justiciar, if we are out of the kingdom, laying before us the transgression, and let them ask that we cause that transgression to be corrected without delay."

Richard L. Perry, ed., *Sources of Our Liberties* 21 (1959).

was in these assemblies of towns or districts that the senti-
ments of the people were formed in the first place, and their
resolutions were taken from the beginning to the end of the
disputes and the war with Great Britain."

Charles F. Adams ed., 5 *The Works of John Adams* 492, 495
(1851) (emphasis added). In prerevolutionary Massachusetts
(then a royal province), the work of the assembly of towns-
people was a necessary element of local and regional gover-
nance. Margaret E. Monsell, *"Stars in the Constellation of the
Commonwealth": Massachusetts Towns and the Constitu-
tional Right of Instruction*, 29 New Eng L Rev 285, 288
(1995). The right of representation to the wider, royal provin-
cial assembly "belonged to the town as a corporate body
rather than to its inhabitants as individuals," so the deliber-
ation and communication of concerns of provincial import,
particularly relations with the crown, rested on the collective
shoulders of townspeople gathered in local assemblies. *Id.* at
291. Individuals within the town meeting drew up instruc-
tions for the town's representative to the provincial body,
"and these would then be debated and voted upon by the
entire town meeting." *Id.* In addition to managing the town's
internal affairs, townspeople developed positions on matters
of regional importance and, at times, instructed repre-
sentatives to take positions directly opposing the British
Parliament. *See, e.g.*, John Adams, *Instructions of the Town
of Braintree to Their Representative Ebenezer Thayer*,
Charles F. Adams ed., 3 *The Works of John Adams* 465, 467
(1851) (urging noncompliance with the Stamp Act of 1765).

Attempts by the British government to ban town
assemblies in Massachusetts catalyzed the Revolution. In
1774, the so-called Intolerable Acts required appointment of
council representatives by royal writ rather than election and
starkly limited town meetings to a single, annual gathering
for the election of assembly representatives. Monsell, 29 New
Eng L Rev at 293. The towns continued to meet in defiance of
the British mandate. *Id.* That year, representatives from
every colony except Georgia met in Philadelphia at the First
Continental Congress to protest the Intolerable Acts, define
America's rights, and limit British power. *See generally*
Erwin C. Surrency, *The Transition from Colonialism to
Independence*, 46 Am J Legal Hist 55 (2004). The Declaration

and Resolves of the First Continental Congress recited that "assemblies have been frequently dissolved, contrary to the rights of the people, when they attempted to deliberate on grievances," and proclaimed: "The inhabitants of the English colonies * * * have a right peaceably to assemble, consider of their grievances, and petition the king; and that all prosecutions, prohibitory proclamations, and commitments for the same, are illegal." Declaration and Resolves of the First Continental Congress, 1774, *reprinted in* Bernard Schwartz, 1 *The Bill of Rights: A Documentary History* 215, 216, 217 (1971). Shortly thereafter, the Declaration of Independence lamented the failure of the British government to answer the concerns of the colonies, stating that colonists' "repeated Petitions have been answered only by repeated injury," and the Revolutionary War ensued.

In the decades after the war, the colonies-turned-states explicitly reserved to the people the right to assemble and instruct (or petition) their political representatives. For example, Article 19 of the Declaration of Rights in the Massachusetts Constitution of 1780 guaranteed the right of the people to assemble in towns for the purpose of consulting about the "common good," in phrasing very similar to Oregon's Article I, section 26:

> "The people have a right, in an orderly and peaceable manner, to assemble to consult upon the common good; give instructions to their representatives, and to request of the legislative body, by way of addresses, petitions, or remonstrances, redress of the wrongs done them, and of the grievances they suffer."

*See also, e.g.,* NC Const, Art 18 (1776) ("the people have a right to assemble together, to consult for their common good, to instruct their Representatives, and to apply to the Legislature, for redress of grievances"); NH Const, Art 32 (1784) ("The people have a right, in an orderly and peaceable manner, to assemble and consult upon the common good, give instructions to their representatives, and request of the legislative body * * * redress * * *."); Pa Const, Art IX, § 20 (1790) ("The citizens have a right in a peaceable manner to assemble together for their common good, and to apply to those invested with the powers of government for redress of grievances.").

Thus, the drafters of the earliest state constitutions labored under the recent memory of British attempts to suppress town meetings and assert control over representative governments. It is not difficult to infer that those actions figured prominently in colonists' decisions to safeguard the right to assemble, and to fuse it to guarantees of the right of instruction and the right to petition the legislature for assistance in redressing wrongs.

In 1791, the Bill of Rights was added to the federal constitution; the First Amendment guaranteed the rights of assembly and petition:[7]

> "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

Significantly, the drafters of the federal bill of rights did not parse into separate amendments the rights of free speech and free assembly; nor did they specify that the right of assembly was "for the purpose of" petition. *See Richmond Newspapers, Inc. v. Virginia*, 448 US 555, 578 n 13, 100 S Ct 2814, 65 L Ed 2d 973 (1980) (discussing deliberations of First Congress concerning assembly rights). Nonetheless, the federal right of assembly was construed in the nineteenth century as the right to gather for the express purpose of consulting to petition the federal government. *See, e.g., Slaughter-House Cases*, 83 US (16 Wall) 36, 118, 21 L Ed 394 (1872) (Bradley, J., dissenting); *see also* Jason Mazzone, *Freedom's Associations*, 77 Wash L Rev 639, 742 (2002) (addressing associations protected by the assembly clause and noting "we have largely overlooked [the] political aspect of associations that lay at the core of their treatment in the early Republic").

In time, the right of assembly and the right of free expression were conflated in the First Amendment. *See, e.g., McDonald v. Smith*, 472 US 479, 490, 105 S Ct 2787, 86 L Ed

---

[7] Like the right of instruction, the right to petition, preferred in some state constitutions and in the First Amendment, was preceded generally by an assembly guarantee. For a discussion of the right to petition in state and federal constitutions, see generally, Gregory A. Mark, *The Vestigial Constitution: The History and Significance of the Right to Petition*, 66 Fordham L Rev 2153 (1998).

2d 384 (1985) (Brennan, J., concurring) ("[W]e have recurrently treated the right to petition similarly to, and frequently as overlapping with, the First Amendment's *other* guarantees of free expression." (Emphasis added.)); *Thomas v. Collins*, 323 US 516, 530, 65 S Ct 315, 89 L Ed 430 (1945) ("It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances. * * * They are cognate rights * * * and therefore are united in the First Article's assurance."). Ultimately, federal constitutional law came to include a guarantee of expressive association, as we discuss in the next section. But no similar development has occurred in Oregon constitutional law. At most, the rights of free expression and assembly or instruction have been simultaneously invoked in certain fact situations and the claims disposed of either separately or together in an almost summary fashion. *See, e.g., Ausmus*, 336 Or at 508.

In sum, from an examination of assembly clauses in their initial social and political contexts, we conclude that they were drafted in literal terms as a reaction against attempts to limit the ability of colonists to assert themselves politically. Assuming that the framers of the Oregon Constitution appreciated the import of the right of assembly for consultation on the common good to the communities that employed it in the late-eighteenth through the mid-nineteenth century, we conclude that the framers intended the assembly clause to accomplish what it recited, that is, to ensure the right to assemble in order to deliberate on matters of public concern as a part of the political process.

We therefore cannot conclude, as the Eagles would have us do, that section 26 confers a right of association that applies to organizations such as the Eagles. No Oregon court has construed the provision in that manner. The text does not address assembly for expressions apart from those directed specifically for the "common good." Nor does the initial political purpose of assembly clauses indicate that the framers of the Oregon Constitution understood section 26 as an expansive guarantee of expressive association or purely social assembly divorced from matters of public concern. Although

it is true that, at the national level, the Eagles have on occasion apparently been known to support particular political objectives, nothing in the record before us, and nothing suggested by the Eagles, indicates that discourse about matters of public concern or political importance occupies anything more than an insignificant amount of aerie time or resources. And to the extent that such matters are a part of the Eagles' mission, nothing in the record suggests that allowing women to join aeries would interfere with that function.

## C. *First Amendment to the United States Constitution*

■   Finally, the Eagles argue that application of the act abridges their members' expressive association rights under the First Amendment, because their membership policy to exclude women is itself "expressive" and that admission of women in the aerie would impair its secret rituals in which aerie members address one another as "Brother" and refer to "manly character" and "Brotherhood." The trial court ruled that the Eagles' claim could not meaningfully be distinguished from a similar claim that was rejected by the United States Supreme Court in *Roberts*. We agree.

The relevant facts in *Roberts* and in the present case are strikingly similar. Like the Eagles, the Jaycees were a national organization whose membership was limited to males, with an associated, nonvoting membership available to women. *Roberts*, 468 US at 613. Like the present case, the litigation in *Roberts* arose under a state statute prohibiting discrimination in public accommodations. Like Oregon's act, the Minnesota Human Rights Act broadly defined "public accommodation" as " 'a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages or accommodations are extended, offered, sold, or otherwise made available to the public.' " *Id.* at 615 (quoting Minn Stat § 363.03 (1982)). Like the Eagles, the Jaycees maintained that the civil rights statute, by compelling them to admit women, violated members' freedom of association. *Id.* at 612.

The Court first held that the First Amendment did, in fact, protect association: "An individual's freedom to speak, to worship, and to petition the government for the redress of

grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Id.* at 622. Thus, the right to associate is "implicit in the right to engage in activities protected by the First Amendment." *Id.* The Court also acknowledged that, in some cases, government interference with a private organization's internal policies could interfere with members' rights to associate for the exercise of free expression: "There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire." *Id.* at 623.

The Court nonetheless emphasized that, even in such cases, the right to associate for expressive purposes is not absolute; rather, its restriction "may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.* Applying those precepts to the Jaycees, the Court determined that the state's goal of "eradicating discrimination against its female citizens," a central purpose of the statute, "plainly serves compelling state interests of the highest order." *Id.* at 623, 624. The Court concluded that the state achieved its interests in the least restrictive way by applying the Human Rights Act to prevent the Jaycees from restricting regular membership to men. *Id.* at 626.

The Court found no evidence that admission of women as regular members would impair the Jaycees' ability to engage in the full range of "civic, charitable, lobbying, fundraising, and other activities worthy of constitutional protection under the First Amendment." *Id.* at 627. In terms that can be applied to the present case with only insignificant alterations, the Court continued:

> "There is * * * no basis in the record for concluding that admission of women as full voting members will impede the organization's ability to engage in these protected activities or to disseminate its preferred views. The Act requires no change in the Jaycees' creed of promoting the interests of young men, and it imposes no restrictions on the organization's ability to exclude individuals with ideologies or philosophies different from those of its existing members.

Moreover, the Jaycees already invites women to share the group's views and philosophy and to participate in much of its training and community activities. Accordingly, any claim that admission of women as full voting members will impair a symbolic message conveyed by the very fact that women are not permitted to vote is attenuated at best."

*Id.* (citations omitted).

The reasoning of *Roberts* was applied in *Bd. of Dirs. of Rotary Int'l v. Rotary Club*, 481 US 537, 107 S Ct 1940, 95 L Ed 2d 474 (1987). There, the defendant, Rotary International (Rotary), was a private humanitarian organization devoted to encouraging high ethical standards in professional contexts and "good will and peace in the world." *Id.* at 539 (citation omitted). Rotary challenged the application of California's public accommodation act, the Unruh Act, to require the admission of women in its all-male clubs. Rotary contended that its exclusionary policy created an "aspect of fellowship" that the men enjoyed, and that the all-male policy facilitated the establishment of clubs in foreign countries. *Id.* at 541. The Court determined that application of the statute did not unduly interfere with the club members' freedom of expressive association, explaining:

"In this case * * * the evidence fails to demonstrate that admitting women to Rotary Clubs will affect in any significant way the existing members' ability to carry out their various purposes. As a matter of policy, Rotary Clubs do not take positions on 'public questions,' including political or international issues. To be sure, Rotary Clubs engage in a variety of commendable service activities that are protected by the First Amendment. But the Unruh Act does not require the clubs to abandon or alter any of these activities. It does not require them to abandon their basic goals of humanitarian service, high ethical standards in all vocations, good will, and peace. Nor does it require them to abandon their classification system or admit members who do not reflect a cross section of the community. Indeed, by opening membership to leading business and professional women in the community, Rotary Clubs are likely to obtain a more representative cross section of community leaders with a broadened capacity for service."

*Id.* at 548-49 (citations omitted). The Court added, "Even if the Unruh Act does work some slight infringement on Rotary

members' right of expressive association, that infringement is justified because it serves the State's compelling interest in eliminating discrimination against women." *Id.* at 549.

■ Thus, both *Roberts* and *Bd. of Dirs. of Rotary Int'l* demonstrate that application of an antidiscrimination law does not impermissibly abridge a group's right to expressive association when the expression resides principally in a membership policy that discriminates based on sex. In the present case, although application of the act would make the gendered language in the aerie rites inaccurate for mixed company, the effect on the entire ritual is slight. Moreover, a preference for male company alone does not amount to a "significant" burden on a group's expressive association. *See Bd. of Dirs. of Rotary Int'l*, 481 US at 548. As in *Roberts*, the record does not support the conclusion that requiring the Eagles to evenhandedly consider women for membership will significantly (or even modestly) impair the Eagles' broad-based social and charitable efforts. *See Roberts*, 468 US at 627. With the exception of the ritual, which is only occasionally performed, and once-weekly aerie membership meetings, all of the Eagles' activities are undertaken by both aerie and auxiliary members. The record indicates that aerie and auxiliary members cooperate directly in recruitment, committee service, fundraising, and charitable activities. Together, they accomplish the principal task of their social mission—socializing—on a daily basis. Finally, the fact that women, for a time, were permitted to join the Willamette aerie and were allowed to remain cuts against any claim that application of the act will impose more than a minor burden. *See Bd. of Dirs. of Rotary Int'l*, 481 US at 549 n 8 ("Appellants' argument [that admission of women will impair the effectiveness of its organization] is undermined by the fact that women already attend the Rotary Clubs' meetings and participate in many of their activities.").

The Eagles rely on *Boy Scouts of America v. Dale*, 530 US 640, 120 S Ct 2446, 147 L Ed 2d 554 (2000), in which the Court held that application of New Jersey's public accommodations law to require the Boy Scouts to retain a homosexual member violated the Boy Scouts' expressive association rights. *Dale* employed the same analysis that the Court

developed in *Roberts* and *Bd. of Dirs. of Rotary Int'l*. It inquired whether the organization engaged in expressive activity; if so, whether requiring the organization to accept the person who was denied membership would interfere in a significant way with that expressive activity; and, if so, whether that interference was accomplished in the least intrusive manner and served a compelling interest. *Dale*, 530 US at 647-48. The Court determined that the Boy Scouts, whose stated mission was the inculcation and transmission of values, including, centrally, the value that homosexuality was immoral and unclean, engaged in expressive activity. *Id.* at 651. Because the antihomosexual value was central, frequently asserted, and long-standing, and because accepting an acknowledged homosexual as a scout leader would send a message of acceptance that was contrary to that value, such acceptance would significantly interfere with the organization's ability to express its message. *Id.* at 654-56. Finally, the Court concluded that "[t]he state interests embodied in New Jersey's public accommodations law do not justify such a severe intrusion on the Boy Scouts' right to freedom of expressive association." *Id.* at 659.

The Eagles' reliance on *Dale* is misplaced. In this case, the slight impairment to the Eagles' expressive activity does not approximate the level of harm that triggered the Court's concern in *Dale*. Whereas, according to the Court, requiring admission of homosexuals to the Boy Scouts would be tantamount to promoting homosexual conduct, a clear violation of that organization's values, the Eagles has not demonstrated any similar harm that accepting women would inflict on its effort or goals—"liberty, truth, justice, equality, for home, for country, and for God." Rather, as in *Roberts* and *Bd. of Dirs. of Rotary Int'l*, "the enforcement of [the act] would not materially interfere with the ideas that the organization sought to express." *Dale*, 530 US at 657. In any case, even if application of the act worked a significant impairment on the Eagles' association rights, the state's compelling interest in remedying gender discrimination by means of the Public Accommodations Act far exceeds any harm to the Eagles' expressive association.

## IV.   CONCLUSION

The Public Accommodations Act applies to the Eagles because, as the trial court found and the Eagles do not dispute, the organization provides amusement and civic services, and it offers them unselectively to the male public. Enforcing the act so as to require the Eagles to consider women for membership on the same terms that they consider men does not violate the organization's members' rights under the state constitution's guarantee of religious freedom, nor does it violate their right freely to assemble to consult for their common good; neither case law, text, context, nor history provides any reason to apply section 26 to groups engaged principally in activities outside of the political realm. Moreover, applying the act will not violate the members' right of expressive association because admitting women will not require the Eagles to send a message contrary to one of the organization's core values, and, even if it did, that interference with associational rights would be justified by the state's compelling interest in eliminating gender discrimination.

The dissent declares that "the import" of our decision "is that females must now be admitted to male-only social organizations and males must be admitted to female-only social organizations, or those establishments are in violation of the law." 202 Or App at 149 (Edmonds, J., dissenting). We disagree. The decision stands only for the proposition that a business or commercial enterprise in Oregon that is otherwise open to the public does not have a constitutional right to discriminate on the basis of gender, and that, in fact, such discrimination violates the Oregon Public Accommodations Act. At this stage in the evolution of our political community, laws permitting the opposite of that conclusion would be cause for alarm.

Affirmed.

**EDMONDS, J.**, dissenting.

I dissent from the majority's opinion for several reasons, as explained in more detail below. At the heart of the issues in this case are the rights of members of either gender

to associate with only that gender. The import of the majority's decision is that females must now be admitted to male-only social organizations and males must be admitted to female-only social organizations, or those organizations are in violation of the law. That result is contrary to Oregon statutes, the Oregon Constitution, and the federal constitution for the reasons that follow.

With regard to the applicability of Oregon's Public Accommodations Act, ORS 30.670 through 30.685,[1] the majority reasons,

"The Eagles' second argument for reconsidering our holding in *Lahmann I* is based on legislative history, and it reduces to the following proposition: When the act was first passed and when it was amended, private fraternal organizations had a well-established, legislatively recognized presence; the sponsors of the act and those who voted on it knew that fact, and they explicitly averred that the act would not apply to those organizations. It would, however, apply to organizations that called themselves private clubs only as a ruse to avoid allowing African-American patrons or members. The short and sufficient refutation of that argument is this: The trial court found as fact, and the Eagles do not deny, that, due to their nonselective membership practices, their organization is *de facto* open to the public. Nothing in the legislative history of the act implies that its framers intended to exempt such organizations."

202 Or App at 131.

The majority's conclusion that *nothing* in the legislative history of the 1973 amendments to the Public Accommodations Act implies that its framers intended to exempt organizations like the Eagles is contrary to the bill's sponsor's testimony before the House Committee on State and Federal Affairs regarding the effect of the proposed amendments. The focus of the amendments was on commercial establishments such as restaurants or other locations that offered their goods and services to the public, not on organizations that provide

---

[1] As noted in the majority opinion, ORS 30.670 to 30.685 were renumbered as ORS 659A.400 to 659A.406 in 2001. References to the Public Accommodations Act in this dissent are to the 1999 version unless otherwise noted.

fraternal benefits. Then-Representative Vera Katz, the sponsor of the bill, was careful to tell the House Committee on State and Federal Affairs, "And men have the right to congregate, if they want to, without women. They've got their private clubs to do that. We're not forcing anybody to integrate, but we're trying to avoid segregation. This bill does not talk to private clubs[.]" Tape Recording, House Committee on State and Federal Affairs, HB 2116, March 2, 1973, Tape 4, Side 2. Another advocate in favor of the same bill, Jane Edwards, representing the American Civil Liberties Union, explained to the House Committee on State and Federal Affairs that,

> "[t]hose who oppose laws prohibiting discrimination generally argue men (or women) have the right to congregate together without members of the opposite sex. This of course is true. However, this bill is not trying to force people to integrate but to prevent public places from segregating. Nothing in the bill precludes private clubs from segregating or precludes people from inviting only members of one sex or the other to their homes."

Testimony, House Committee on State and Federal Affairs, HB 2116, March 2, 1973, Ex 6.

So, in light of the above legislative history, how did the majority arrive at the destination of declaring that nothing in the legislative history of the act implies that its framers intended to exempt organizations like the Eagles? Some judicial sleight of hand is at work to turn the intent of the legislature on its head.

In a letter opinion to the parties, the trial court wrote:

> "While some members were interested in charitable work to some degree, it was clear that the driving force for becoming a member of the Eagles was social activities. The witnesses and the exhibits heavily emphasized friendship, dancing, food and the bar. It is this Court's opinion that the Eagles is mainly a social club."

The trial court further observed, "As stated in [ORS 30.675, the statute] setting out requirements for public accommodation, the Eagles provide " * * * services, * * * amusements or otherwise." Then, focusing on the majority's opinion in

*Lahmann I*, the trial court inquired whether the Eagles' membership is so unselective that the organization can fairly be said to offer its services to the public. 180 Or App at 434. Based on the record before it, the court concluded:

> "It is also this Court's opinion that the Eagles met the second criteria as set out in the Court of Appeals opinion. Either the written requirements, or actual practices of this Aerie are so loose and non selective that it can easily be said that the Eagles offer their services to the public. The net effect of these very easy membership requirements is that it cannot be said that the Eagles are " '* * * in its nature distinctly private.' "

The majority appears to affirm the trial court based on what it characterizes as a finding of fact by the trial court and the perceived notion that the Eagles do not contest that finding. The majority declares that the Eagles "do not deny, that, due to their nonselective membership practices, their organization is *de facto* open to the public." 202 Or App at 131. First, a more careful reading of the Eagles' brief demonstrates that they do in fact deny that they are open to the public. In their summary of argument, they assert, "Oregon's Public Accommodation Act was not intended to control the membership policies of *private* fraternal organizations, or to interfere with the right of such organizations to admit members based on criteria of their own choosing." (Emphasis added.) Later, the Eagles assert, "The FOE [Fraternal Order of the Eagles] is not a business or commercial enterprise, and it is 'in its nature distinctly private,' within the meaning of that phrase in [ORS 30.675(2)]." In fact, one of the subheadings of their brief is titled, "The exemption in the Act for a 'bona fide club * * * which is in its nature distinctly private' was intended to apply to a fraternal organization, and it does apply to the Eagles." (Omission in original.) Under that subheading, the Eagles devote seven full pages of their brief to their argument that they are within the "distinctly private" exemption under ORS 30.675(2), and they point to facts such as "the business meetings of an Eagles Aerie are conducted in secrecy, in rooms that 'are totally enclosed and no one is able to see inside' "; "Willamette Aerie owns its own buildings in Salem, and no one has access to meetings of the Aerie or the

Auxiliary or to the social areas of the building unless they are members"; and some people join the Eagles "precisely *because* it is a private club." (Emphasis in original.)

Second, ORS 30.675(2) excludes from the definition of a place of public accommodation "any institution, bona fide club or place of accommodation which is in its nature distinctly private." Whether that exclusion applies to the Eagles is a mixed question of fact and legislative intent and not, as the majority proposes, just a question of fact. As a factual matter, the trial court found that the Eagles accept only men as members. The trial court also found that, "[u]nder the regulations adopted by the Grand Aerie, in order to become a member, a person must be sponsored by two members, complete an application and be approved by the majority of members at a membership meeting." Also, the court was critical of the Willamette Aerie because "sometimes only one sponsor is required" and "the emphasis was on obtaining new members and new member approval was being granted in almost all cases." As noted above, the trial court further found that the Eagles are primarily a social club. For purposes of this opinion, I assume that the trial court's findings are supported by the evidence.

The subsequent question of law posed by the statute's requirement is whether the legislature would have considered those facts as disqualifying circumstances for purposes of the exemption in ORS 30.675(2). Nothing in the text of the statute tells us that whether an organization "is in its nature distinctly private" is determined by nonselective membership requirements. In fact, the words of the statute require a different reading when given their ordinary meaning. The word "nature" in context means "(a) the essential character or constitution of something * * *[;] (b) the distinguishing qualities or properties of something * * *." *Webster's Third New Int'l Dictionary* 1507 (unabridged ed 2002). The word "distinctly" in context means "(b) with distinctness; not confusedly; without a blending or merging of one thing with another." *Id.* at 659. The word "private" in context means "not freely available to the public." *Id.* at 1804. Read together, the words of the statute describe an organization that is, in its essential character, not freely available to the public at

large.[2] The trial court found that the Eagles are "mainly a social club." The benefit of membership in the Eagles, therefore, is the ability to associate with other Eagles, *i.e., private* association. Regardless of whether the Eagles' membership policy is considered nonselective, the fact remains that one who joins the Eagles sets himself apart from the general public and, at that point—and only at that point—may participate in private initiation ceremonies, memorialized rituals, and weekly membership meetings. The Eagles are, by the common and ordinary meaning of the words, in their nature distinctly private.

In reaching a contrary conclusion, the trial court and the majority commit an error of statutory construction. Rather than construing the plain meaning of the act, the trial court and the majority essentially substitute the word "selective" for the word "private" in ORS 30.675(2). Moreover, they conflate subsections (1) and (2) of ORS 30.675. ORS 30.675(2) provides that an organization that offers its services to the public is exempt from the act if it is "in its nature distinctly private." Yet the trial court and the majority appear to assume that, if an organization offers its services to the public and is nonselective as to whom it offers its services, it cannot be "in its nature distinctly private."[3] That reading effectively renders subsection (2) superfluous; if the only

---

[2] In my dissent in *Lahmann I*, I stated, "The Eagles are not, at least for purposes of this case, a 'bona fide club or accommodation which is in its nature distinctly private.' Some of their activities, including the furnishing of food, beverages, and social amusements, are not distinctly private and, in fact, the evidence shows that those activities are open to both genders." 180 Or App at 437 (Edmonds, J., dissenting). I erroneously interpreted ORS 30.675(2) in my original dissent. The fact that some of the Eagles' activities are open to Auxiliary members—who also have chosen an affiliation with the Eagles—does not change the distinctly private nature of the Eagles or prevent the Eagles from deciding that certain other benefits will not be available to Auxiliary members. As further discussed in this dissent, the Eagles, at their core, remain an organization that provides a benefit of association for social purposes not freely available to the public, and have the right under Oregon and federal law to determine which of their rituals will be open solely to its male members.

[3] In its letter opinion, the trial court first concludes that "[e]ither the written requirements, or actual practices of this Aerie are so loose and non selective that it can easily be said that the Eagles offer their services to the public[,]" which is relevant for purposes of determining whether the Eagles come within ORS 30.675(1).

organizations that come within subsection (2) are organizations that do not offer services to the public under subsection (1)—and therefore are not within the meaning of the act—subsection (2) is read out of existence. *See Keller v. SAIF*, 175 Or App 78, 82, 27 P3d 1064 (2001), *rev den*, 333 Or 260 (2002) ("We will not construe a statute in a way that renders its provisions superfluous."). If the exemption for "private" organizations under subsection (2) is to have any effect, whether an organization is "in its nature distinctly private" cannot depend *exclusively* on whether its services are offered to the public. The focus of the inquiry must instead be on the *nature* of the benefits offered and the purpose of the organization. In this case, the Eagles offer a benefit of private association for social purposes and are, in their nature, distinctly private.[4]

Assuming that there is some ambiguity in the phrase "in its nature distinctly private," that ambiguity is resolved by the legislative history of the Public Accommodations Act. As described above, the bill's sponsor expressly represented to the legislature that "men have the right to congregate, if they want to, without women." Nothing in the text of the act or its legislative history suggests that an organization that allows individuals to congregate exclusively with members of the opposite sex is somehow covered by the act if the organization is otherwise unselective. The trial court found that the driving force for becoming a member of the Eagles was to be involved in social activities, and that finding is supported by the evidence. In sum, the majority by judicial fiat effectively holds that, without additional selective membership criteria, men no longer have the right to congregate for social activities outside the presence of women under the

---

Yet, in the very next sentence of that opinion, the trial court assumes that the same analysis determines whether the exemption in ORS 30.675(2) applies: "The net effect of these very easy membership requirements is that it cannot be said that the Eagles are '* * * in its nature distinctly private.'"

[4] The "private" nature of the Eagles, an organization that solicits memberships for private association, is in contrast with organizations like Lloyd Lions Club or Costco that, while requiring "membership," simply use the membership as a tool for selling commercial or business advantages. In *Lloyd Lions Club v. Int. Assoc. of Lions Clubs*, 81 Or App 151, 724 P2d 887 (1986), we recognized that an organization that sells memberships in that manner is not a "private" organization. We did not hold in that case, as the majority suggests, 202 Or App at 130, that an organization is not "in its nature distinctly private" simply because it has a nonselective membership policy.

Public Accommodations Act. I dissent because the majority has rewritten ORS 30.675(2) to mean something that the legislature never intended.

The second ground on which I dissent is the majority's holding that Article I, section 26, of the Oregon Constitution does not extend protection to the members of the Eagles to assemble to engage in what are primarily social activities. Article I, section 26, provides:

> "No law shall be passed restraining any of the inhabitants of the State from assembling together in a peaceable manner to consult for their common good; nor from instructing their Representatives; nor from applying to the Legislature for redress of greviances (*sic*)."

According to the majority, "the framers intended the assembly clause to accomplish what it recited, that is, to ensure the right to assemble in order to deliberate on matters of public concern *as a part of the political process*." 202 Or App at 142 (emphasis added). It follows, under the majority's reasoning, that Article I, section 26, does not confer "a right of association that applies to organizations such as the Eagles." *Id*.

The majority writes a limitation into Article I, section 26, that is not contained within the text of the provision. Under the majority's view, the right to assemble is limited to assembly to deliberate on matters that are part of the political process. In *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992), the Oregon Supreme Court established the methodology for ascertaining the intent of the framers of a constitutional provision:

> "There are three levels on which [the] constitutional provision [at issue] must be addressed: Its specific wording, the case law surrounding it, and the historical circumstances that led to its creation."

The validity of the majority's proposed limitation on the scope of section 26 does not survive scrutiny under that methodology.

The text of section 26 does not limit its guarantee to assembly *only* for purposes of political discourse. Rather, the section guarantees the right to assemble "in a peaceable manner to consult for [the] common good." As the majority

appropriately observes, section 26 differs in text and context from its federal First Amendment counterpart, and therefore its meaning must be separately analyzed under the *Priest* methodology. The phrase "to consult for [the] common good" would have been understood at the time of the adoption of the constitution to be broader in scope than if the phrase guaranteed a right to assemble to consult only "as a part of the political process." The word "common" at that time had an ordinary meaning in the context in which it is used in section 26; it meant and means, "1. Belonging equally to more than one, or to many indefinitely; as, life and sense are *common* to man and beast; the *common* privileges of citizens; the *common* wants of men." Noah Webster, *An American Dictionary of the English Language* 42 (1828). The word "good" also had an ordinary meaning when used in the context of section 26. It meant and means, "Welfare; prosperity; advancement of interest or happiness. He labored for the *good* of the state. The *good* of the whole community can be promoted only by advancing the *good* of each of the members composing it. *Federalist, Jay.*" Webster, *An American Dictionary* at 93. Fraternal organizations, formed for a common good (in this case, socializing with members of the same gender), fall within the plain language of the section as it would have been understood by its framers.

The majority complicates the otherwise plain language of section 26, in part based on the conclusion that "[t]he purpose of the group deliberation, determining and promoting 'the common good' of the 'inhabitants,' also indicates political objectives." 202 Or App at 136. The common good can, and often does, involve political objectives and political action. Yet, no one reasonably can deny that the common good, the welfare, and the prosperity of the citizens of Oregon in 1857 concerned more than political issues. The common good certainly included amusement, friendship, and other components of the civic and social fabric of life in Oregon.

Moreover, even assuming that the plain language of the section indicates, as its primary purpose, association for political objectives, that purpose necessarily implies a corresponding right to associate with others for political, social, economic, and cultural ends. If the freedom to assemble to

petition the government is to be safeguarded, individuals first must be permitted to associate for a variety of nonpolitical reasons, and thereby discover their collective needs. *Cf. Roberts v. United States Jaycees*, 468 US 609, 622, 104 S Ct 3244, 82 L Ed 2d 462 (1984) ("[W]e have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."). The majority acknowledges that, "at the national level, the Eagles have on occasion apparently been known to support particular political objectives * * *." 202 Or App at 143. That the Eagles, through the association of members, have identified and pursued political objectives demonstrates exactly why the freedom to associate is essential to the freedom of assembly for political objectives.

The second prong of the *Priest* methodology for interpreting the Oregon Constitution is an examination of case law. There is no case law surrounding section 26 that supports the majority's interpretation that the provision is limited to assembly for political discourse.[5]

The final prong of the *Priest* methodology concerns the historical circumstances that led to the adoption of section 26. In the absence of documentation about the framers' purpose for enacting section 26 (or any of its likely models, for that matter), the majority looks to what it describes as " 'historical circumstances' more generally." 202 Or App at 138. In doing so, the majority focuses not on the circumstances in Oregon at the time of the adoption of section 26, but on the significance of assembly clauses to framers in colonial America. Oregon's constitution, however, was drafted more than three-quarters of a century later, and the nature of local government and the significance of private associations had changed. As the Eagles aptly point out in their brief, fraternal orders became extremely popular in the nation in the first half of the nineteenth century as its population spread west.

---

[5] The majority states that, "[w]hen Oregon courts discuss section 26, they do so exclusively in that [political advocacy] context." 202 Or App 134. The fact that Oregon appellate courts have discussed a constitutional provision in one particular context does not mean that the provision is inapplicable in all other contexts.

The very idea of these fraternal organizations was to unify individuals for a common purpose. Active in the territory of Oregon by the 1850s were the Masons and the Independent Order of Odd Fellows (IOOF). Other kinds of organizations soon followed and were formed in the state for purposes of association around a common vocation or theme, such as the Grange or temperance groups. It would have been inconceivable for an Oregon citizen in 1857 to have believed that *only* political groups assembled for the common good, and that his or her right to discuss matters of common welfare in a group was limited to discourse that was part of the political process.

For those reasons, the majority fails in its duty to interpret section 26 as it was intended by the citizens of Oregon in 1857.

Finally, I disagree with the analysis of the majority under the freedom to assemble provision of the First Amendment because its analysis does not engage meaningfully with the actual nature of the Eagles' activities, as found by the trial court. The trial court found, and the evidence supports the finding, that the overriding purpose of the Eagles is to provide a forum for social activities. According to the trial court, the organization "heavily emphasize[s] friendship, dancing, food and the bar." No United States Supreme Court decision has held that a state may require persons who join together for social activities to admit to their membership those of the opposite gender.

The majority, like the trial court, determines that the "Eagles' [First Amendment] claim [can]not meaningfully be distinguished from a similar claim that was rejected by the United States Supreme Court in *Roberts*." 202 Or App at 143. In *Roberts*, the issue was whether a state public accommodations law that compelled the United States Jaycees to accept females as regular members infringed on the organization's members' freedom to associate only with members of their own gender. The Court observed that the "[f]reedom of association therefore plainly presupposes a freedom not to associate." *Roberts*, 468 US at 623. The Court then declared that the right to associate for expressive purposes is not, however, absolute. Rather, "[i]nfringements on that right may be justified by regulations adopted to serve compelling

state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.* Based on those predicate principles, the Court examined the application of the state law to the Jaycees in light of its peculiar activities. The Jaycees' activities included expression on political, economic, cultural, and social affairs involving a variety of civic, charitable, lobbying, fundraising, and other public activities. The Court concluded that, although those activities are protected by the First Amendment, there was "no basis in the record for concluding that admission of women as full voting members will impede the organization's ability to engage in these protected activities or to disseminate its preferred views." *Id.* at 627.

Although the members of the Willamette Eagles engage in some charitable activities, it is, as the trial court found, "mainly a social club." That factual difference is important in two respects: (1) it distinguishes the state interest at issue in this case from the interest at issue in *Roberts*; and (2) it highlights the seriousness of the burden on the Eagles' expressive activities. I will address these issues in turn.

In *Board of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 US 537, 549, 107 S Ct 1940, 95 L Ed 2d 474 (1987), the Court specifically identified the compelling interest that was at issue in *Roberts*: "In *Roberts* we recognized that the [s]tate's compelling interest in assuring equal access to women extends to the acquisition of leadership skills and business contacts as well as tangible goods and services." *Board of Directors of Rotary Int'l* involved that same compelling interest. 481 US at 550. In this case, however, the only interest at stake is assuring women equal access to social interaction with men. The United States Supreme Court has never recognized such an interest as "compelling."

Moreover, the factual differences between this case and *Roberts* demonstrate the serious burden the act places on the ability of members of the Eagles to express their beliefs in the intrinsic value of single-gender social interaction. In *Roberts*, the organizational purpose at play was to take public positions on a number of diverse issues as well as to

engage in the public activities previously described. 468 US at 626-27. Similarly, in *Board of Directors of Rotary Int'l*, the stated purposes of the organization were to provide humanitarian service, to encourage high ethical standards in all vocations, and to help build world peace and good will. Rotary International aspired to include a "representative of every worthy and recognized business, professional, or institutional activity in the community." 481 US at 540 (quoting 2 Rotary Basic Library, Club Service 67-69 (1981)).

The purposes of the above organizations—which exist to provide public service—are in stark contrast to the Eagles, which exists to allow its members to engage in fraternal rites and eat and drink with one another. Part of that social purpose includes secret rituals during which Aerie members address one another as "Brother"; male Eagles pray and sing about "Brotherhood"; and they refer to "the finest traits of a manly character." Auxiliary members, in their own rituals, refer to "Sisterhood," and to "Womanhood, to Motherhood, and to Home." The majority improperly dismisses these separate rituals with the conclusory statement that mixed company would have only a "slight" effect on the entire ritual.[6] 202 Or App at 146. As the United States Supreme Court stated in *Boy Scouts of America v. Dale*, 530 US 640, 653, 120 S Ct 2446, 147 L Ed 2d 554 (2000), courts must "give deference to an association's view of what would impair its expression." Had the Eagles, like the Jaycees and Rotary International, been primarily a business or public service organization, the inclusion of women may have only a slight impact on the expressive activities of its members. However, the Eagles' primary purpose is social interaction, and admitting members who are not otherwise wanted interferes in the most serious way with that purpose.

---

[6] The majority states that, "[w]ith the exception of the ritual, which is only occasionally performed, and once-weekly aerie membership meetings, all of the Eagles' activities are undertaken by both aerie and auxiliary members." 202 Or App at 146. The majority impermissibly substitutes its own view of the importance of the male-only ritual and weekly aerie meetings for that of the Eagles. The lesson from *Boy Scouts of America v. Dale*, 530 US 640, 661, 120 S Ct 2446, 147 L Ed 2d 554 (2000), is that an organization's own views of its message must be respected, and that "public or judicial disapproval of a tenet of an organization's expression does not justify the [s]tate's effort to compel the organization to accept members where such acceptance would derogate from the organization's expressive message.

Ultimately, in cases such as this, "the associational interest in freedom of expression has been set on one side of the scale, and the [s]tate's interest on the other." *Boy Scouts of America*, 530 US at 658-59. The inclusion of unwanted members in the Eagles—a social club—is a most severe intrusion on the Eagles' rights to freedom of expressive association. Yet the state interest involved—allowing women to participate in social rites with men—does not justify that intrusion. For that reason, the First Amendment prohibits the state from forcing the Eagles to accept female members through the application of the act.

In summary, the majority's interpretation of the Public Accommodations Act in this case is at odds with the express intention of the sponsor of the 1973 amendments upon which the majority relies. Apparently, then-Representative Vera Katz recognized that there would be constitutional difficulties if the legislature attempted to regulate what she described as the "right of men to congregate, if they want to, without women." She was right. History demonstrates that Article I, section 26, when evaluated under the *Priest* criteria, was intended to protect the right of fraternal groups to socialize with members of their own gender. That same right is protected by the First Amendment.[7] This court does not have the authority to change the federal and state constitutions, but that is the effect of the majority's decision.

I dissent for all of the above reasons.

---

[7] The majority concludes by stating that, "[a]t this stage in the evolution of our political community," laws permitting the Eagles to discriminate on the basis of gender "would be cause for alarm." 202 Or App at 148. This case, however, involves the Eagles' *constitutional* rights. The prevailing views of the present political community do not define those rights. As the Supreme Court stated in *Boy Scouts of America*,

"the fact that an idea may be embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view."

530 US at 660.