Argued and submitted October 10, 2011, reversed and remanded April 11, 2012

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MARK N. BABSON,
*Defendant-Appellant.*

Marion County Circuit Court
09C41582; A144037 (Control)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MICHELE C. DARR,
*Defendant-Appellant.*

Marion County Circuit Court
09C41583; A144038

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

TERESA L. GOOCH,
*Defendant-Appellant.*

Marion County Circuit Court
09C41584; A144039

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MARGARET M. MORTON,
*Defendant-Appellant.*

Marion County Circuit Court
09C41593; A144042

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

GEORGE G. MEEK,
*Defendant-Appellant.*

Marion County Circuit Court
09C41594; A144043

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

GREGORY J. CLELAND,
*Defendant-Appellant.*

Marion County Circuit Court
09C41581; A144345

279 P3d 222

Timothy R. Volpert argued the cause for appellants Mark N. Babson, Michele C. Darr, Teresa L. Gooch, Margaret M. Morton, and George G. Meek. With him on the briefs were Alan J. Galloway and Davis Wright Tremaine LLP.

Jossi Davidson argued the cause for appellant Gregory J. Cleland. With him on the brief was Gracey & Davidson.

Judy C. Lucas, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

SCHUMAN, P. J.

**SCHUMAN, P. J.**

Defendants were arrested on the steps of the state capitol in Salem while conducting a day-and-night vigil to protest the deployment of Oregon National Guard troops to Iraq and Afghanistan. The state charged, and defendants do not deny, that defendants at the time of the arrest were in violation of a rule that prohibited use of the capitol steps between 11:00 p.m. and 7:00 a.m. They were subsequently convicted of second-degree criminal trespass, a misdemeanor that the state chose to treat as a violation, and fined $500 each. On appeal, they argue that the rule making their presence on the steps unlawful was not properly promulgated or authorized and that, if it was, then—as written and as applied against them—it violated their rights of free expression and assembly under the Oregon Constitution, as well as their free speech rights under the United States Constitution. We conclude that the rule was properly promulgated and that, on its face, it does not violate any provision of the Oregon Constitution. We also conclude, however, that whether the rule was lawfully enforced against defendants depends on whether the motive driving the enforcement was a desire to protect public safety, as the state maintains, or to stifle defendants' expression, as they maintain, and that the trial court erred in preventing defendants from questioning two members of the Legislative Assembly who might have provided relevant and significant testimony on that question. We therefore reverse and remand with instructions to allow defendants to question the two legislators on that specific issue. Because the result of that remand could obviate the need to address federal law, we do not reach the federal constitutional question.

At the outset, we note that defendants do not focus their argument on the criminal trespass statute itself, which provides, "A person commits the crime of criminal trespass in the second degree if the person enters or remains unlawfully in * * * or upon premises." ORS 164.245(1). Entering or remaining in premises occurs "unlawfully" when "the premises, at the time of such entry or remaining, are not open to the public[.]" ORS 164.205(3)(a). The focus of defendants' challenge is the rule that purportedly rendered the capitol steps "not open to the public" at the time of their arrests.

That rule (the "overnight rule") was promulgated by the Legislative Administrative Committee (LAC) and provides, in part,

> "Overnight use of the [capitol] steps is prohibited, and activities on the steps may be conducted only between 7:00 am and 11:00 pm, or during hours between 11:00 pm and 7:00 am when legislative hearings or floor sessions are taking place."

## I. LEGITIMACY AND RULEMAKING AUTHORITY OF THE LAC

Before arguing that the overnight rule violates their individual rights under the state and federal constitutions, defendants argue that the rule is procedurally unconstitutional for three reasons: because rules promulgated by the LAC do not meet the Oregon Constitution's requirements for legislation (passage by both chambers, presentation to the governor, etc.); because the existence of the LAC as an entity with rulemaking power is not authorized anywhere in the Oregon Constitution; and because the rule authorizes members of the legislative branch to exercise an executive function (law enforcement) contrary to Article III, section 1, of the Oregon Constitution.[1]

The LAC is established pursuant to ORS 173.710: "The Legislative Administration Committee hereby is established as a joint committee of the Legislative Assembly." Although it is staffed by a nonlegislator administrator, all of its members are legislators. ORS 173.730(1). Among the LAC's duties is "[c]ontrol [of] all space and facilities within the State Capitol and such other space as is assigned to the Legislative Assembly." ORS 173.720(1)(g). To carry out that duty, the LAC "may adopt rules," ORS 173.770, provided that it gives "reasonable notice of its intent to adopt rules and conduct a hearing open to the public" beforehand, ORS 173.770(2). Those procedural requirements were met with respect to the rule that defendants challenge.[2] To the extent

---

[1] Article III, section 1, of the Oregon Constitution provides, in part:

"[N]o person charged with official duties under one [department of government] shall exercise any of the functions of another, except as in this Constitution expressly provided."

[2] At trial, defendants appeared to argue that the LAC did not provide adequate notice of the meetings at which the overnight rule was enacted and amended. The

that defendants question the statutory authority for the LAC to exist and promulgate rules, their challenge fails.

The same is true of their argument that, although the LAC may have statutory authority to exist and to promulgate rules, the committee's rulemaking authority itself is not authorized by the constitution. Underlying that argument is the assertion that authoritative rules must be enacted either by initiative or through the familiar procedures set out in Articles IV and V of the Oregon Constitution: preliminary reading, passage in both chambers by requisite numbers, signing by presiding officers, presentation to and signing by the governor, etc. That assertion is not correct. Several provisions of Article IV allow for unicameral rulemaking. Section 11, for example, gives each chamber the authority to "determine its own rules of proceeding"; Article IV, section 14, provides that "[e]ach house shall adopt rules" to ensure open deliberations. We cite these particular provisions not as authority for LAC rules, but to demonstrate that the Oregon Constitution authorizes the Legislative Assembly, with respect to its own governance, to enact some rules outside of the formal legislative process.

The more general provision conferring on the Legislative Assembly the authority to govern itself is Article IV, section 17: "Each house shall have all powers necessary for a branch of the Legislative Department, of a free, and independant [*sic*] State." As Chief Justice John Marshall famously wrote regarding the word "necessary" in the "necessary and proper" clause of the United States Constitution,

> "we find that it frequently imports no more than that one thing is convenient, or useful, or essential to another. To employ the means necessary to an end, is generally understood as employing any means calculated to produce the end, and not as being confined to those single means, without which the end would be entirely unattainable."

*McCulloch v. Maryland*, 17 US 316, 413-14, 4 L Ed 579 (1819). We readily conclude that, given the nineteenth century understanding of the word "necessary," the power to promulgate rules regulating physical access to its chambers falls within the

---

record does not support that argument, and, in any event, lack of proper notice is not assigned as error on appeal.

ambit of powers "necessary" for a free and democratic legislature. And our conclusion is bolstered by our prudential reluctance to interfere in the *operations* of a co-equal branch. *See State ex rel. Stadter v. Patterson*, 197 Or 1, 13, 251 P2d 123 (1952) (citing Article I, section 17, in support of legislature's authority to extend constitutional terms of office for legislators).

Nor does the overnight rule offend separation of powers principles. Defendants appear to contend that, by authorizing the LAC to direct the arrest of rule violators, the LAC rules confer enforcement authority, an executive function, on a body within the legislative branch. But the LAC has no enforcement authority. Its own rules contain no such grant, and if they did, the grant would be ineffectual because it would be beyond the duties conferred on the LAC by statute. The executive function of enforcement is left to employees of the executive department—in this case, Oregon State Police. In sum, the promulgation of the overnight rule did not violate any of the structural or procedural provisions of the Oregon Constitution.

## II.   CLAIMS UNDER THE OREGON BILL OF RIGHTS

Our conclusion that the overnight rule is constitutionally authorized does not, of course, mean that the rule is immune from the constitutional limitations imposed on all government action, usually by a provision in a bill of rights. Nor does our reluctance to interfere in the legislature's control of its own operations extend to the exercise of judicial review for constitutionality of generally applicable enactments. In this case, defendants argue that the overnight rule violates the Oregon Constitution's limitations on enactments that infringe on free expression and assembly, as well as the United States Constitution's free speech guarantee. We begin with defendants' state constitutional arguments. *State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983).

### A.   *Article I, section 8*

The review of enactments for compliance with Article I, section 8,[3] follows a by-now familiar template, first

---

[3] Article I, section 8, of the Oregon Constitution provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

articulated in *State v. Robertson*, 293 Or 402, 409, 649 P2d 569 (1982), and succinctly summarized in *State v. Plowman*, 314 Or 157, 164, 838 P2d 558 (1992), *cert den*, 508 US 974 (1993):

> "First, the court [in *Robertson*] recognized a distinction between laws that focus on the *content* of speech or writing and laws that focus on proscribing the pursuit or accomplishment of *forbidden results*. 293 Or at 416-17. The court reasoned that a law of the former type, a law 'written in terms directed to the substance of any "opinion" or any "subject" of communication,' violates Article I, section 8,

>> " 'unless the scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach.' *Id.* at 412.

> "Laws of the latter type, which focus on forbidden results, can be divided further into two categories. The first category focuses on forbidden effects, but expressly prohibits expression used to achieve those effects. * * * Such laws are analyzed for overbreadth:

>> " 'When the proscribed means include speech or writing, however, even a law written to focus on a forbidden effect * * * must be scrutinized to determine whether it appears to reach privileged communication or whether it can be interpreted to avoid such 'overbreadth.' [*Id.* at 417-18.]

> "The second kind of law also focuses on forbidden effects, but without referring to expression at all. Of that category, this court wrote:

>> " 'If [a] statute [is] directed only against causing the forbidden effects, a person accused of causing such effects by language or gestures would be left to assert (apart from a vagueness claim) that the statute could not constitutionally be applied to his particular words or other expression, not that it was drawn and enacted contrary to article I, section 8.' *Id.* at 417."

(Emphasis in original; footnote omitted; second omission and second through fourth brackets in *Plowman*.) *Robertson*, *Plowman*, and numerous subsequent Article I, section 8,

cases, then, divide the universe of enactments that are subject to a challenge under that provision into three categories. The first consists of enactments directed toward expression *per se*, such as an anti-obscenity statute that imposes penalties for uttering specified words. *See State v. Henry*, 302 Or 510, 732 P2d 9 (1987). The second category consists of enactments that are directed toward some regulable results and "expressly prohibit" expression used to achieve those results, *Plowman*, 314 Or at 164, such as a statute that penalizes threats to coerce a person into performing an act that she has the right to refuse, *Robertson*, 293 Or 402. The third category (or, in *Plowman* terms, the second part of the second category) consists of enactments that regulate or prohibit conduct "without referring to expression at all," *Plowman*, 314 Or at 164, but may, when enforced, interfere with a person's expression. An example is a statute that imposes a penalty for criminal trespass, imposed against a political protestor. *Huffman and Wright Logging Co. v. Wade*, 317 Or 445, 857 P2d 101 (1993). Each of these types of enactment is reviewed for constitutionality under different rules. Thus, the first step in reviewing an enactment under Article I, section 8, is to determine the enactment's category.

Defendants contend that the overnight rule falls into the second category, and it is unconstitutional because such enactments must not be overbroad; the overnight rule is overbroad, they then maintain, because it prohibits significant amounts of constitutionally protected expression such as, for example, defendants'. That argument demonstrates a fundamental misunderstanding of clear and settled Article I, section 8, jurisprudence. Statutes fall into the first category only if they expressly forbid speech. *State v. Moyer*, 348 Or 220, 229, 230 P3d 7, *cert den*, ____ US ____ , 131 S Ct 326 (2010); *Vannatta v. Oregon Government Ethics Comm.*, 347 Or 449, 455-56, 222 P3d 1077 (2009), *cert den*, ____ US ____ , 130 S Ct 3313 (2010); *State v. Johnson*, 345 Or 190, 194, 191 P3d 665 (2008). They fall into the second category only if they specify a harm and "expressly" provide that speech or some other form of intentionally communicative activity is one way to cause that harm. *Plowman*, 314 Or at 164; *Robertson*, 293 Or at 415 (statute is in second category if it is "directed *in terms* against the pursuit of a forbidden effect" (emphasis

added)).[4] The overnight rule does not expressly or obviously regulate speech or communication; rather, it addresses conduct that, in some situations (such as the one at issue here—an overnight protest) may involve expression, but in other situations (for example, a late night capitol steps skateboarder or passed-out drunk) do not.

Such enactments, the Supreme Court emphatically and recently held, cannot be subjected to a facial challenge—that is, a challenge asserting that the enactors of the rule violated the constitution *when they enacted it*, regardless of how the enactment is enforced. *State v. Illig-Renn*, 341 Or 228, 233-34, 142 P3d 62 (2006). The reach of the contrary position—that a speech-neutral statute could be declared unconstitutional if its enforcement in some circumstances could interfere with constitutionally protected activity—would, for example, lead to the invalidation of every trespass statute, because such statutes can be enforced so as to stifle speech, and every arson statute, because such statutes can be enforced against symbolic speech such as burning an effigy or a draft card. Rather, such enactments are susceptible to challenge only as applied to the facts of a particular case. *Robertson*, 293 Or at 417; *Illig-Renn*, 341 Or at 234 ("[O]ur prior cases *do* foreclose the possibility of a facial challenge under Article I, section 8, to a 'speech-neutral' statute." (Emphasis in original.)).

The question before us then becomes whether the enforcement of the overnight rule in this case unlawfully interfered with defendants' free expression rights. At oral argument, defendants maintained for the first time that the enforcement of a speech-neutral rule violates Article I, section 8, *whenever* the enforcement interferes with protected expression. In support of that contention, they cited *City of Eugene v. Miller*, 318 Or 480, 871 P2d 454 (1994). We reject that argument. Defendants' reliance on *Miller* is misguided, albeit understandable. In that case, the defendant was cited while standing on a Eugene sidewalk selling books. *Id.* at

---

[4] Although the court in *State v. Illig-Renn*, 341 Or 228, 234-35, 142 P3d 62 (2006), qualifies "expressly" by noting in passing that a law is in the first or second *Robertson* category if it "expressly *or obviously*" proscribes expression or "*more or less* expressly" does so (emphasis added), we do not regard those qualifications as significant or as bearing on our analysis of the overnight rule.

482-83. He was tried and convicted of violating an ordinance that prohibited causing sidewalk congestion by, among other things, conducting sales. *Id.* at 482. The court first noted that, by regulating sales and solicitation, the ordinance expressly implicated speech; the court then decided, however, that, even presuming that the ordinance was speech-neutral, its enforcement against the defendant "violates Article I, section 8, because, as applied to defendant, it unreasonably impinges on the dissemination of expressive material that is itself protected under Article I, section 8." *Id.* at 486. The court also stated:

> "When a law is challenged 'as applied' under the third *Robertson* category, [*i.e.*, as a speech-neutral law,] the question is whether the law was applied so that it did, in fact, reach privileged communication. [*Robertson*, 293 Or at 417-18.] Under that approach, the question in these cases is whether application of the pertinent provisions of the Eugene Code by the City of Eugene has limited the sale of defendant's joke books in a manner that impermissibly burdens his right of free speech guaranteed by Article I, section 8."

*Miller*, 318 Or at 490 (emphasis omitted). From these isolated quotations, defendants maintain that the court ruled that a speech-neutral law can *never* be enforced so as to impinge on free expression. That is not what the court in *Miller* held. Rather, the court held only that the Eugene ordinance *"impermissibly"* burdened speech because it was content-based: "So long as the city chooses to make its sidewalks available for *some* general commercial activity, * * * it may not treat a vendor of expressive material more restrictively than vendors of other merchandise—at least not without being able to offer some explanation[.]" *Id.* at 490-91 (emphasis in original).

If, as defendants argue, no speech-neutral law could ever be enforced in circumstances where the enforcement interfered with expression, Article I, section 8, would have a staggering reach. A person could stand in the middle of Broadway in downtown Portland during rush hour and render himself or herself immune from prosecution for obstructing traffic, through the simple expedient of engaging in political advocacy at the same time. An illegally parked car could

not be towed if it bore a political bumper sticker. A person could claim immunity from the enforcement of trespass law by carrying a political placard while chained to logging equipment. Or a business could claim exemption from a zoning restriction by including the sale of books or magazines at the check-out counter. That could not be the law.

And in fact, according to undisturbed precedent from this court and the Supreme Court, that is *not* the law.

"Cases interpreting Article I, section 8, establish that a person cannot immunize herself or himself from the application of speech-neutral laws by accompanying otherwise illegal conduct with expressive activity. '[S]*peech accompanying punishable conduct* does not transform conduct into expression under Article I, section 8.' *Huffman and Wright Logging Co.*, [317 Or at 452] (emphasis in original) [(trespassing protesters not immune despite expressive conduct while trespassing)]; *see also City of Portland v. Tidyman*, 306 Or 174, 182, 759 P2d 242 (1988) ('A grocery store gains no privilege against a zoning regulation by selling *The National Enquirer* and *Globe* at its check-out counter.')."

*City of Eugene v. Lincoln*, 183 Or App 36, 43, 50 P3d 1253 (2002).

Rather, to determine whether the enforcement of a speech-neutral statute violates an individual's rights under Article I, section 8, we apply the analysis that we described and explained in *Lincoln*. That case involved the as-applied challenge to a city ordinance when it was enforced against demonstrators protesting the treatment of animals at a circus held on the Lane County fairgrounds. *Id.* at 38-40. The ordinance made it a crime to refuse to leave property that was open to the public "after being lawfully directed to do so by the person in charge." *Id.* at 39 (citing Eugene City Code 4.805, 4.807). After deciding that the ordinances were speech-neutral and therefore not susceptible to a facial challenge, we stated:

"Those who enforce and execute the law, like those who make it, must target regulable harm and not expression *per se* apart from harm. We must therefore decide, in this as-applied challenge, whether the city's enforcement of the criminal trespass statute against defendant had as its

objective the prevention of some harm within its power to prevent or whether its objective was to prevent protected speech."

*Id.* at 43. We went on to hold that, under the facts in that case, the officers' motive was to prohibit protected speech and not to prevent harm. *Id.* at 44. Consequently, we reversed the defendant's conviction. *Id.* at 45.

The question before us on this aspect of defendants' appeal, then, is whether the state's enforcement of the overnight rule against defendants was directed toward defendants' expression or toward some speech-neutral objective. Defendants argue that the state's claimed objectives, public safety and capitol security, were pretexts masking the real objective, which was to stifle defendants' actual and symbolic protest. In support of that position, they note that, in the recent past, at least two groups—a church group conducting a Bible-reading marathon and participants in a three-on-three basketball tournament—had been permitted to use the steps overnight without interference. They also note that the LAC met to discuss the overnight rule immediately after the protest began, that one legislator on the committee referred pointedly to "the situation out on the steps, if I may say so, if you all understand what I'm talking about," that the first arrest of a demonstrator occurred within hours after the first LAC meeting to discuss the overnight rule adjourned (those charges were dropped), and that the arrests in this case occurred after the LAC had amended the rule to eliminate the administrator's discretion to allow some groups to stay on the steps overnight.

The court, however, found as fact that the LAC not only enacted the rule in pursuit of public safety objectives, but that the rule was enforced against defendants for those purposes as well: it found that Burgess, the LAC administrator appointed after the Bible-reading marathon and the three-on-three tournament,

"has consistently applied the Guidelines in a content-neutral manner, informing other groups that they would not be permitted to use the steps from 11:00 pm to 7:00 am. * * * The court finds that * * * [e]nforcement of the Guidelines is not based on the content of Defendants' speech.

Rather, the Guidelines are reasonable restrictions based on important public purposes."

Some facts in the record support the court's finding. Defendants lit candles and, on one occasion, used a heating device, despite the fact that three fires had recently occurred in the capitol, one of which resulted in long-term closure of the Governor's office. One demonstrator had called the police after she was threatened by an intoxicated and angry observer at 3:15 a.m., and the protest had attracted homeless individuals and at least one unregistered sex offender. Burgess testified that he was motivated by public safety concerns and not defendants' protest message. Although we might weigh the evidence and come to a different finding (or not), that is not our role on appeal; we must affirm the trial court's finding regarding the enforcers' intent if it is supported by any competent evidence in the record, Or Const, Art VII (Amended), § 3, and, as described above, such evidence exists.

We are not, however, compelled to affirm the trial court's finding if the court erroneously excluded evidence that, if admitted and considered, could have led to a different outcome. According to defendants, that is what occurred here. They contend that the court erred in preventing them from introducing two highly relevant sources of evidence regarding the motive underlying enforcement of the overnight rule: the testimony of Burgess, the LAC administrator, regarding whether he was instructed to enforce the rule based on the content of defendants' protest, and the testimony of the LAC co-chairs regarding whether they ever instructed Burgess, the state police, or anybody else to that effect.

Regarding Burgess's testimony, we conclude that defendants' argument fails. During his testimony, in response to a question about whether he had had conversations with members of the legislature, Burgess indicated that he had talked to Representative Gelser and Senator Courtney. The following colloquy occurred:

"Q [BY DEFENSE ATTORNEY]: And what did Representative Gelser say to you about [the protest]?

"[PROSECUTOR]:   Objection; hearsay.

"THE COURT:   Sustained.

"[DEFENSE ATTORNEY]:   Your Honor, that is not offered to prove the truth. Go ahead—no, don't go ahead.

"THE COURT:   I sustained the objection.

"[DEFENSE ATTORNEY]:   I'm going to ask the same question. What did [Senator] Courtney say about—

"[PROSECUTOR]:   Same—

"THE COURT:   Sustained.

"* * * * *

"[DEFENSE ATTORNEY]: Did [Representative] Hunt ever indicate to you in advance of the November 13, 2008 meeting that he didn't think you were enforcing the policy properly?

"[PROSECUTOR]:   Same objection.

"THE COURT:   Sustained."

Defense counsel then went to a different line of questioning without making an offer of proof.

On appeal, defendants argue that the court erred in sustaining the prosecutor's objections because the legislators' statements were not offered to prove the truth of the matter asserted. OEC 801(3). The state responds that defendants did not adequately preserve their claim of error and that we cannot review it because defendants did not provide an offer of proof as required under OEC 103(1)(b) (no evidentiary error unless, "[i]n case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked").

Regardless of whether defendants adequately met preservation requirements, we agree with the state that defendants' failure to make an offer of proof disclosing "the substance of the evidence" at issue is fatal to the assignment of error. OEC 103(1)(b). The purpose of an offer of proof is to provide the trial court with the information it needs in order to determine the merits of the objection and to permit this

court to review the trial court's decision. *State v. Affeld,* 307 Or 125, 128, 764 P2d 220 (1988) (offer of proof necessary to assure appellate court can determine if error occurred and whether it was likely to have affected the verdict). Without knowing the substance of Burgess's answers, we are unable to gauge whether the ruling that precluded him from giving those answers was prejudicial.

Defendants also argue that they should have been permitted to question the co-chairs of the LAC in order to determine whether they instructed Burgess or anybody else to enforce the overnight rule against defendants based on disapproval of the content of defendants' expression. Defendants emphasized that they did not intend to question the co-chairs with respect to the intent underlying the *enactment* of the rule, but with respect to subsequent instructions relative to the *enforcement* of the rule. As their counsel argued to the trial court, they wanted to question "the two co-chairs of the LAC going directly to the issue not of their intent of what the statute means, but going to the issue of what the motivation was in suddenly deciding in November of 2008 to enforce this policy against these defendants."

To gain access to that information, defendants subpoenaed the co-chairs. The state filed motions to quash, arguing that the co-chairs, as legislators, were entitled to immunity from process under Article IV, section 9, of the Oregon Constitution, which provides:

> "Senators and Representatives in all cases, except for treason, felony, or breaches of the peace, shall be privileged from arrest during the session of the Legislative Assembly, and in going to and returning from the same; and shall not be subject to any civil process during the session of the Legislative Assembly, nor during the fifteen days next before the commencement thereof: *Nor shall a member for words uttered in debate in either house, be questioned in any other place.*"

(Emphasis added.) The court granted the state's motion to quash. Because the dispute involved subpoenas and not an arrest, and the entire trial occurred when the legislature had long been out of session and long before a new session was to begin, the court could have relied only on the italicized

Debate Clause. On appeal, defendants renew their conten-
tion that the co-chairs could have provided relevant evidence
and that the court therefore should not have quashed the
subpoenas. The state reasserts its argument under the
Debate Clause.

That provision has never been construed by an
Oregon court. In doing so now, we attempt to discern the
intent of the drafters of Article IV, section 9, and of the people
who adopted it. *State v. Hirsch/Friend*, 338 Or 622, 631, 114
P3d 1104 (2005). Our goal is to understand the provision's
wording "in the light of the way that wording would have
been understood and used by those who created the provi-
sion," *Vannatta v. Keisling*, 324 Or 514, 530, 931 P2d 770
(1997), and yet, at the same time, to "apply faithfully the
principles embodied in the Oregon Constitution to modern
circumstances as those circumstances arise," *State v. Rogers*,
330 Or 282, 297, 4 P3d 1261 (2000). In the absence of relevant
Oregon case law, our analysis examines the provision's text
and the historical circumstances that led to its creation.
*Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992).

It is beyond dispute that, no matter how expansively
one wants to construe the text of the Debate Clause, its literal
language does not prevent defendants from compelling the
legislators to answer questions about whether they
instructed the LAC administrator or the state police to arrest
defendants because of their expression. By no feat of expan-
sive interpretation could such instruction be considered to
have occurred "in debate in either house." The only official
discussion of the overnight rule occurred in a joint committee,
and the matter of enforcement was never discussed, much
less "debated" there. The text of the Debate Clause favors
defendants' position.

The text, however, must be seen through the prism
of the historical circumstances surrounding the provision's
adoption. Debate clauses originated in the common law of
England—at least according to Thomas Jefferson. Thomas
Jefferson, Protest to the Virginia House of Delegates 1797, 8
*Works of Thomas Jefferson* 322-23 (1797), *reprinted in* Philip
B. Kurland & Ralph Lerner eds., 2 *The Founders'
Constitution* 336 (1987). It was first reduced to statutory law

in 1689, when it was enacted in the English Bill of Rights: "That the freedom of speech, and debates or proceedings in parliament, ought not to be impeached or questioned in any court or place out of parliament." 1 W & M, Sess 2, c 2, *reprinted in* Kurland & Lerner eds., 2 *The Founders' Constitution* at 319.

> "Underlying that classic formulation of the doctrine in 1689 was a bitter and protracted history of conflict and disagreement, especially during the Tudor and Stuart monarchies, over their respective powers. The Crown, in particular, was greatly disturbed at the increasing assertions of greater parliamentary power, particularly Parliament's intrusions into the once sacrosanct and reserved areas of royal succession and religion. The clashes which ensued from the Crown's efforts to repress the growing power and independence of Parliament were in large measure responsible for the clear-cut enunciation of the doctrine of legislative privilege in the statement of fundamental rights which was adopted in 1689."

Alexander J. Cella, *The Doctrine of Legislative Privilege of Freedom of Speech and Debate: Its Past, Present and Future as a Bar to Criminal Prosecutions in the Courts*, 2 Suffolk U L Rev 1, 4-5 (1968); *see also* Steven F. Huefner, *The Neglected Value of the Legislative Privilege in State Legislatures*, 45 Wm & Mary L Rev 221, 229-30 (2003). A clause similar to the English version appeared in the constitutions of the colonies, the Articles of Confederation, and, of course, the United States Constitution at Article I, section 6, clause 1, which specifies that, "for any Speech or Debate in either House, [Senators or Representatives] shall not be questioned in any other Place." *Id*. at 231-32.

The first reported American case construing a debate clause—and, in fact, the only reported American case as of 1859—was *Coffin v. Coffin*, 4 Mass 1 (1808). The facts were undisputed:

> "[T]he defendant and Russell were members of the House of Representatives, then in session. * * * [Russell], having some acquaintance with the plaintiff, and thinking highly of his integrity, was applied to by him to move a resolution for the appointment of an additional notary for Nantucket, the town represented by the defendant. Russell made the

motion, and had leave to lay the resolution on the table. The defendant, in his place, inquired where Russell had the information of the facts on which the resolution was moved. The witness answered, from a respectable gentleman from Nantucket. The resolution then passed, and the speaker took up some other business. Russell then left his place, and was standing in the passage-way, within the room, conversing with several gentlemen. The defendant, leaving his place, came over to Russell, and asked him who was the respectable gentleman, from whom he had received the information he had communicated to the house. Russell answered carelessly, he was perhaps one of his relations, and named Coffin, as most of the Nantucket people were of that name. The witness, then, perceiving the plaintiff sitting behind the bar, pointed to him, and informed the defendant he was the man. The defendant looked towards him, and said, 'What, that convict?' Russell, surprised at the question, asked the defendant what he meant; he replied, 'Don't thee know the business of Nantucket Bank?' Witness said, 'Yes, but he was honorably acquitted.' The defendant then said, 'That did not make him less guilty, thee knows.' It further appears that this conversation passed a little before one o'clock, that the election of notaries was not then before the house, but was made that afternoon, or the next day, and that the plaintiff was not a candidate for that office. And there is no evidence that the resolution laid on the table by Russell, and passed, or the subject matter of it, was ever after called up in the house."

*Id.* at 24-25. The plaintiff sued in tort. In defense, the defendant claimed that his speech was privileged by virtue of the Massachusetts Constitution's debate clause: "The freedom of deliberation, speech, and debate, in either house of the legislature, is so essential to the rights of the people, that it cannot be the foundation of any accusation or prosecution, action or complaint, in any other court or place whatsoever." Mass Const of 1780, Part I, Art XXI (*quoted in Coffin*, 4 Mass at 7).

In resolving the case, the court wrote an opinion that is frequently cited as an endorsement of an expansive and liberal interpretation of the debate clause, *e.g.*, *Kilbourn v. Thompson*, 103 US 168, 203-04, 26 L Ed 377 (1880); 49 Op Atty Gen 167 (1999), and indeed in some respects it is. The key paragraphs state:

"These privileges are thus secured, not with the intention of protecting the members against prosecutions for their own benefit, but to support the rights of the people, by enabling their representatives to execute the functions of their office without fear of prosecutions, civil or criminal. I, therefore, think that the article ought not to be construed strictly, but liberally, that the full design of it may be answered. I will not confine it to delivering an opinion, uttering a speech, or haranguing in debate, but will extend it to the giving of a vote, to the making of a written report, and to every other act resulting from the nature and in the execution of the office. And I would define the article as securing to every member exemption from prosecution for everything said or done by him as a representative, in the exercise of the functions of that office, without inquiring whether the exercise was regular, according to the rules of the house, or irregular and against their rules. I do not confine the member to his place in the house; and I am satisfied that there are cases in which he is entitled to this privilege when not within the walls of the representatives' chamber.

"He cannot be exercising the functions of his office as member of a body, unless the body be in existence. The house must be in session, to enable him to claim this privilege; and it is in session, notwithstanding occasional adjournments, for short intervals, for the convenience of its members. If a member, therefore, be out of the chamber, sitting in committee, executing the commission of the house, it appears to me that such member is within the reason of the article, and ought to be considered within the privilege. The body of which he is a member, is in session and he, as a member of that body, is in fact discharging the duties of his office. He ought, therefore, to be protected from civil or criminal prosecutions for every thing said or done by him in the exercise of his functions, as a representative, in committee, either in debating, in assenting to, or in draughting a report. Neither can I deny the member his privilege, when executing the duties of his office, in a convention of both houses, although the convention should be holden in the senate chamber."

*Coffin*, 4 Mass at 27-28. The privilege, then, extended beyond speech and debate, and its operation was not confined to what the legislator said in the legislative chamber—although it was confined to what was said during a legislative session

and applied only to what was said or written "as a representative, in the exercise of the functions of that office." *Id.*

Further, the court *rejected* the defendant's argument, on the ground that the defamatory speech was not "said or done by him as a representative, in the exercise of the functions of that office." *Id.* at 27-30. The dispositive question, according to the court, was whether the defendant,

> "in speaking the defamatory words [was] executing the duties of his office? Or, in other language, was he acting as a representative? If he was, he is entitled to the privilege he claims; if he was not, but was acting as a private citizen, as a private citizen he must answer."

*Id.* at 29. The court asked rhetorically, "What part of [the defendant's] legislative duty was he now performing [when he slandered the plaintiff]?" *Id.* at 30. The answer determined the outcome of the case: "It is not, therefore, possible for me to presume that the defendant, in using thus publicly the defamatory words, even contemplated that he was in the discharge of any official duty." *Id.*

*Coffin,* as noted, was the only reported case as of 1857, when the Oregon Constitution was drafted. The records of the constitutional convention disclose no substantive discussion of the Debate Clause. They do reveal, however, that the clause was taken from the Indiana Constitution of 1816 and, as approved after a third reading, stated, "Nor shall a member, for words uttered in debate in either house, be questioned in any other place." Claudia Burton, *A Legislative History of the Oregon Constitution of 1857—Part II (Frame of Government: Articles III-IV),* 39 Willamette L Rev 245, 263, 286 (2003). Judge Matthew Deady, the chair of the convention, later suggested amending the text to, "Nor shall a member, for any speech or debate in either house be questioned in any other place, provided such speech had been actually made during a session of said house." Charles H. Carey, *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857* 280 (1926). One reporter observed, "Deady moved to amend section 9 so that no member should be questioned for anything *actually* said in debate, but that the protection should not extend to speeches made on paper and never really delivered." *Oregon*

*Argus* 2 (Sept 12, 1857) (emphasis in original) (quoted in Burton, 39 Willamette L Rev at 286-87 n 218). The amendment did not pass and the version introduced after the third reading was enacted without recorded discussion. Carey, *The Oregon Constitution and Proceedings* at 280. That version has not changed. We read nothing substantive into the rejection of the Deady amendments, although it is possible that, as a judge, he was aware of *Coffin* and his amendment was intended to narrow the privilege by eliminating protection for written words. "Since no reported discussion exists regarding the Debate Clause, we presume that the original understanding of Article IV, section 9, reflects the understanding of similar provisions in the United States Constitution and in other state constitutions." 49 Op Atty Gen at 171.

That understanding was captured by the United States Supreme Court in *Kilbourn*, 103 US at 204, in which the Court called *Coffin* "perhaps, the most authoritative case in this country on the construction of the provision in regard to freedom of debate in legislative bodies[.]" The Court reiterated the Massachusetts case's essential holding:

> "It would be a narrow view of the constitutional provision to limit it to words spoken in debate. The reason of the rule is as forcible in its application to written reports presented in that body by its committees, to resolutions offered, which, though in writing, must be reproduced in speech, and to the act of voting, whether it is done vocally or by passing between the tellers. *In short, to things generally done in a session of the House by one of its members in relation to the business before it.*"

*Id.* (emphasis added).

Indulging the fiction that the framers of the Oregon Constitution were aware of *Coffin* and understood it in the same way that, 21 years later, the *Kilbourn* court did—a fiction perhaps rendered less implausible by the fact that *Coffin* was the only then-extant American interpretation of any debate clause, and the statement in *Kilbourn* that *Coffin* was "the most authoritative case in this country on the construction of the provision," 103 US at 204—we can conclude that the framers did not intend to adopt a strict, literal interpretation of the debate clause, but, at the same time, they

intended it to apply only to statements by legislators uttered during a legislative session. Moreover, the clause applied only to statements made in the exercise of their legislative functions or duties even when, as in *Coffin*, the statements were on the same subject as proposed legislation. Were we to interpret the provision based solely and narrowly on our best inference as to what, precisely, the drafters intended, our inquiry into the historical circumstances surrounding the adoption of the provision would be at an end. However, the court now adheres to the proposition that the purpose of constitutional interpretation "is not to freeze the meaning of the state constitution in the mid-nineteenth century. Rather it is to identify, in light of the meaning understood by the framers, relevant underlying principles that may inform our application of the constitutional text to modern circumstances." *State v. Davis*, 350 Or 440, 446, 256 P3d 1075 (2011).

The principles underlying the Debate Clause are manifest. The courts and commentators have identified three. Originally, speech or debate clauses served to protect the legislative branch from the crown and, in America, from other branches. Cella, 2 Suffolk U L Rev at 3-16. Another purpose was to enable legislators to speak freely without fear of retribution from other branches or members of the public; hence, the clause was invoked in *Coffin* and later in *Hutchinson v. Proxmire*, 443 US 111, 99 S Ct 2675, 61 L Ed 2d 411 (1979), to insulate legislators from defamation claims. As one of the authors of the United States Constitution explained,

> "[i]n order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offence."

James D. Andrews, ed., 2 *Works of James Wilson* 38 (1896) (*quoted in Tenney v. Brandhove*, 341 US 367, 373, 71 S Ct 783, 95 L Ed 1019 (1951)); *accord Powell v. McCormack*, 395 US 486, 503, 89 S Ct 1944, 23 L Ed 2d 491 (1969) ("Our cases make it clear that the legislative immunity created by the Speech or Debate Clause performs an important function in

representative government. It insures that legislators are free to represent the interests of their constituents without fear that they will be later called to task in the courts for that representation."); *Coffin*, 4 Mass at 27 (purpose of the clause is "to support the rights of the people, by enabling their representatives to execute the functions of their office without fear of prosecutions, civil or criminal"). Finally, the clause serves to protect legislators from being distracted by the necessity of defending themselves in court. *Powell*, 395 US at 505 ("Freedom of legislative activity and the purposes of the Speech or Debate Clause are fully protected if legislators are relieved of the burden of defending themselves."). Hence, the requirement that the words be uttered during a legislative session. Always, though, these purposes were conditioned, and the conferral of immunity limited, by the inherent democratic aversion to privilege, as summarized by Thomas Jefferson, *quoted in Hutchinson*, 443 US at 125: "[The privilege] is restrained to things done in the House in a Parliamentary course * * * For [the Member] is not to have privilege * * * to exceed the bounds and limits of his place and duty." *See also id.* (" 'The arcana of privilege, and the arcana of prerogative, are equally unknown to our system of jurisprudence.' " (Quoting Andrews ed., 2 *Works* at 35.)). We have no reason to believe that the framers of the Oregon Constitution had any other principles in mind.

Nor are we aware of many "modern circumstances" that would bear on modifying the original understanding. Presuming that the evolution of Speech or Debate Clause interpretations by the United States Supreme Court are instructive, we infer that, in response to the increasing complexity of the legislative process, the clause has become more protective with respect to the speakers to whom it applies. Thus, in *Gravel v. United States*, 408 US 606, 616-17, 92 S Ct 2614, 33 L Ed 2d 583 (1972), the Court held that, for purposes of the Speech or Debate Clause, Senator Gravel and his legislative aide would be treated as one. The Court explained:

"[I]t is literally impossible, in view of the complexities of the modern legislative process, with Congress almost constantly in session and matters of legislative concern constantly proliferating, for Members of Congress to perform

their legislative tasks without the help of aides and assistants; that the day-to-day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos[.]"

In all other respects, however, almost nothing has evolved since *Coffin*, 4 Mass at 27-28: The rule applies not only to speech uttered in debate, but to written reports, legislation-related discussion in committees, resolutions, votes, and "everything said or done by [a member], as a representative, in the exercise of the functions of that office," so long as those words are uttered "in session." *Accord Kilbourn*, 103 US at 204.[5] The clause does not apply to written or spoken words uttered while the legislature is not in session, nor to words that are uttered beyond the exercise of the legislative function. *Id.*

Under that understanding of the Debate Clause, we conclude that defendants were entitled to question the legislators, but only about any instructions or other communications that they might have given to or had with the LAC administrator or others regarding *enforcement* (as opposed to *enactment*) of the overnight rule. Such instructions or communications fail the requirement that protected speech be an exercise of the legislative function.

We reach that conclusion on the basis of several considerations. First, as a general matter, the enforcement of laws and rules is the quintessential executive function. *See* Or Const, Art V, § 10 (Governor, head of executive branch, "shall take care that the Laws be faithfully executed"). Article III, section 1, of the Oregon Constitution prohibits members of one branch from the "exercise [of] any of the functions of another, except as in this Constitution *expressly* provided" (emphasis added), and nothing in the constitution expressly confers any enforcement functions on members of the legislature. If, therefore, the legislators participated in the

---

[5] *Kilbourn* continues to be favorably cited. *E.g.*, *Bogan v. Scott-Harris*, 523 US 44, 49, 52, 118 S Ct 966, 140 L Ed 2d 79 (1998); *Hutchinson*, 443 US at 126; *Eastland v. United States Servicemen's Fund*, 421 US 491, 502, 95 S Ct 1813, 44 L Ed 2d 324 (1975); *Doe v. McMillan*, 412 US 306, 311, 93 S Ct 2018, 36 L Ed 912 (1973); *United States v. Brewster*, 408 US 501, 509, 92 S Ct 2531, 33 L Ed 2d 507 (1972); *Gravel*, 408 US at 618; *Powell*, 395 US at 501; *United States v. Johnson*, 383 US 169, 180, 86 S Ct 749, 15 L Ed 2d 681 (1966).

enforcement of the overnight rule, that participation was not the exercise of any power conferred on the legislature by the constitution. It is true, as we decided above, 249 Or App at 283-84, that the language of Article IV, section 17 ("Each house shall have all powers necessary for a branch of the Legislative Department, of a free, and independant [*sic*] State.") is general and elastic enough to encompass the power to promulgate regulations concerning the operation of the legislature and its facilities, without the same degree of formality required of ordinary legislation. But allowing rule creation without bicameralism or presentation is nothing more than a variation of the core institutional function of legislatures. Executing rules is not.

Second—and again presuming that, at least in the absence of decisions from Oregon courts, United States Supreme Court decisions are instructive—the case law developing the concept of "legislative" functions supports a definition that would not include the speech about which defendants seek to question the legislators. The Massachusetts court's opinion in *Coffin*, on which the United States Supreme Court (by way of *Kilbourn*) based its Speech or Debate Clause jurisprudence, concluded that the legislator was *not* protected for speech directly related to a matter under consideration by the legislature—the qualifications of a man who would be nominated by resolution for an official office—because the speech impugning that man's character was not "part of his legislative duty" in that it "might have been made, for all the purposes intended by him, in State Street, or in any other place, as well as in the representatives' chamber[.]" 4 Mass at 30. In *Gravel*, 408 US at 621, the Court observed, "[N]o prior case has held that Members of Congress would be immune if they executed an invalid resolution by themselves carrying out an illegal arrest, or if, in order to secure information for a hearing, themselves seized the property or invaded the privacy of a citizen."

The most fully developed discussion of what speech qualifies as legislative for purposes of the Speech or Debate Clause occurs in *United States v. Brewster*, 408 US 501, 92 S Ct 2531, 33 L Ed 2d 507 (1972). In rejecting an argument that the Court in an earlier case, *United States v. Johnson*,

383 US 169, 86 S Ct 749, 15 L Ed 2d 681 (1966), had adopted an expansive scope of coverage for the Speech or Debate Clause, the Court reiterated,

> "Appellee argues, however, that in *Johnson* we expressed a broader test for the coverage of the Speech or Debate Clause. It is urged that we held that the Clause protected from executive or judicial inquiry all conduct 'related to the due functioning of the legislative process.' It is true that the quoted words appear in the *Johnson* opinion, but appellee takes them out of context; in context they reflect a quite different meaning from that now urged. * * * Mr. Justice Harlan wrote:

> " 'No argument is made, nor do we think that it could be successfully contended, that the Speech or Debate Clause reaches conduct, such as was involved in the attempt to influence the Department of Justice, that is in no wise *related to the due functioning of the legislative process*. It is the application of this broad conspiracy statute to an improperly motivated speech that raises the constitutional problem with which we deal.' 383 US at 172. (Emphasis added; footnote omitted.)

> "In stating that those things 'in no wise related to the due functioning of the legislative process' were *not* covered by the privilege, the Court did not in any sense imply as a corollary that everything that 'related' to the office of a Member was shielded by the Clause. Quite the contrary, in *Johnson* we held, citing *Kilbourn v. Thompson*, *supra*, that only *acts generally done in the course of the process of enacting legislation* were protected."

*Brewster*, 408 US at 513-14 (second emphasis added). The speech about which defendants here sought to inquire occurred well *after* the process of enacting the overnight rule. Once the rule was enacted, the legislative function ended, and with it the immunity conferred by the Debate Clause ended as well. The acts, if they occurred, were not "essential to legislating." *Gravel*, 408 US at 621. The court therefore erred in quashing defendants' subpoenas. Because that act prevented defendants from questioning the legislators about facts at the core of the as-applied challenge to the overnight rule, the error was prejudicial.

## B. *Article I, section 26*

Article I, section 26, of the Oregon Constitution provides:

> "No law shall be passed restraining any of the inhabitants of the State from assembling together in a peaceable manner to consult for their common good; nor from instructing their Representatives; nor from applying to the Legislature for redress of grievances [*sic*]."

Defendants maintain that their peaceable presence on the capitol steps to urge Oregon officials to take action against the deployment of Oregon National Guard troops to Iraq and Afghanistan amounted to protected assembly, instruction of their "Representatives," and an application to the legislature and governor for "redress of grievances." We analyzed the scope of Article I, section 26, in *Lahmann v. Grand Aerie of Fraternal Order of Eagles*, 202 Or App 123, 134-35, 121 P3d 671 (2005), *rev den*, 341 Or 80 (2006), concluding that,

> "[t]he section's wording suggests that 'assembling together' refers to assembly for deliberation about issues affecting the welfare of the public (the 'common good' of 'the inhabitants'), and the balance of the section protects the ability of 'the inhabitants' to give practical effect to their deliberations by ensuring that they may voice their determinations to others who might respond politically."

We agree with defendants that, under *Lahmann*, they were engaging in activity protected by Article I, section 26, when they were arrested. That fact alone, however, does not mean that the arrest violated their rights of assembly, instruction of legislators, or application to government for redress of grievances—what we for convenience refer to as "assembly rights"—any more than the fact that they were engaging in protected expression means that their arrest violated Article I, section 8. Indeed, the two provisions are subject to similar analyses, leading in this case to similar outcomes. That conclusion is compelled by *Illig-Renn*. In that case, the Supreme Court held:

> "[T]he freedoms that sections 8 and 26 of Article I guarantee, speech and assembly, are closely associated. Indeed, the right of assembly guaranteed by the latter provision protects an important aspect of the freedom of expression

> protected by Article I, section 8—it assures that those who speak may have an audience. We think that it follows that the two constitutional provisions are subject to the same analytical framework, including that part of the framework that limits facial overbreadth challenges to statutes that 'in terms' proscribe constitutionally protected conduct."

341 Or at 236 (citation omitted). The "analytical framework," we presume, is one that divides laws that may have an impact on the right of assembly into those that, in terms, regulate the protected activity (hypothetical example: "No group of two or more Oregon inhabitants may convene a meeting in order to discuss income inequality."); laws that focus on a regulable, unprotected harm, but expressly specify that a protected activity is a means of achieving that harm (hypothetical example: "No group of two or more Oregon inhabitants may protest income inequality by blocking traffic."); and laws that do not mention the protected activity but, in being enforced, could have the effect of regulating it (hypothetical example: "No group of two or more Oregon inhabitants may obstruct traffic," enforced against a group obstructing traffic while protesting income inequality.). The analytical framework imported from Article I, section 8, cases, then, dictates that a law of the third type is not susceptible to a facial challenge, and it will succumb to an as-applied challenge only if the enforcement is intended to interfere with or prevent the protected activity and not to achieve some assembly-neutral objective.

The overnight rule is assembly neutral. Article I, section 26, as we have noted, encompasses three protected activities: peaceful assembly for political purposes, instruction of representatives, and application to government for redress of grievances. The rule—"Overnight use of the steps is prohibited, and activities on the steps may be conducted only between 7:00 am and 11:00 pm"—does not expressly mention or necessarily imply any of these activities. It prohibits *presence* on the capitol steps, but presence is not necessarily assembly for the common good. Indeed, it is not even necessarily assembly; as defendants acknowledge, "assembly is constitutionally significant because it is a group of people." A lone apolitical person present on the capitol steps after 11 p.m. is in violation of the rule. More obviously, the rule

does not mention or necessarily imply instruction of representatives or application for redress of grievances. In short, just as a speech-neutral trespass law can, in some situations, be enforced in such a way as to impair speech, so too can an assembly-neutral law be enforced in such a way as to impair the rights protected under Article I, section 26. In neither case does the law proscribe a protected right *per se*, and, it follows from *Illig-Renn*, in neither case is the law susceptible to a facial challenge. Thus, defendants' challenge under Article I, section 26, can succeed only if defendants can establish that no evidence supports the trial court's finding that the rule was enforced for public safety reasons and not for reasons having to do with assembly rights. Thus, the court's error in quashing defendants' subpoenas must be remedied before we can determine whether the arrest violated Article I, section 26, as well as Article I, section 8.

### III.   FIRST AMENDMENT CLAIM

The First Amendment applies to the states by virtue of its incorporation within the Fourteenth Amendment's command that no state shall deprive a person of life, liberty, or property, without due process of law. *Grosjean v. American Press Co.*, 297 US 233, 243, 56 S Ct 444, 80 L Ed 660 (1936). Until we can determine whether the state's law, including its constitutional law, has deprived defendants of the rights they seek to vindicate under the United States Constitution, any opinion we might render based on the First and Fourteenth Amendments would be premature. *Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981).[6]

---

[6] In a concurring opinion in *State v. Stoudamire*, 198 Or App 399, 417-18, 108 P3d 615 (2005) (Landau, J., concurring), Judge Landau points out that the United States Supreme Court has stated in *Zinermon v. Burch*, 494 US 113, 125, 110 S Ct 975, 108 L Ed 2d 100 (1990), that "the [federal] constitutional violation * * * is complete when the wrongful action is taken, * * * not when a state court decides that state law does not afford a remedy." For that reason, Judge Landau suggests, "it is perhaps no longer tenable to suggest that state courts are without authority to reach federal law issues if state law affords relief." *Id.* at 418. Judge (now Justice) Landau may be correct, but we adhere to the traditional and well-settled "first things first" procedure described in *Sterling v. Cupp.* We do so for two reasons: First, the language from *Zinermon* is *dictum.* The Court's statement that a federal violation occurs when the wrongful action is taken refers to wrongful action involving a violation of the Bill of Rights, while the case itself, a Section 1983 tort claim, deals with a procedural violation. For procedural violations, the court holds, the wrongful action does not occur until it has been determined that the state did not provide a remedy. *Zinermon*, 494 US at 126-27. Second, and more importantly, the

## IV. CONCLUSION

In sum, the overnight rule was properly promulgated by the Legislative Administration Committee. Further, defendants' claims that the overnight rule, on its face, violates Article I, section 8, or Article I, section 26, fail as well; the rule does not expressly prohibit speech or assembly and is therefore susceptible to challenge only as enforced in a particular case. In this case, the success of that challenge depends on whether the motive behind the enforcement was or was not to impinge on defendants' rights of expression or assembly. Two legislator members of the LAC might have been able to provide testimony that was relevant to that determination, but the trial court quashed defendants' subpoenas of those legislators on the ground that the legislators had immunity from questioning under Article IV, section 9, of the Oregon Constitution. We conclude that the legislators did not have that immunity and, consequently, the court erred in quashing the subpoenas. We therefore reverse and remand so that defendants can question the legislators that they subpoenaed, but only with respect to whether either or both of them expressly or implicitly instructed or encouraged the LAC administrator or any other person to enforce the rule against defendants because of the content of their expression or the purpose of their assembly.[7]

Reversed and remanded.

---

Oregon Supreme Court has not repudiated the first-things-first doctrine as expressed in *Sterling*, and until it does, we choose to follow it (although, in some instances where a rights claimant obviously prevails under the federal constitution regardless of whether the state law vindicates the claim, we will, as a matter of judicial efficiency, decide the case under the federal constitution without treating the state law issue). In any event, it is undeniable that we may refrain from deciding the federal issue as a matter of prudence. *Stoudamire*, 198 Or at 418 (Landau, J., concurring).

[7] Defendant Meek makes a separate argument contesting the constitutionality of the overnight rule and its enforcement against him based on the assertion that he was a photojournalist. He cites no authority, and we have found none, that would lead us to apply any different analysis to his claim than to the other defendants'.